**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

DEC 19 2002

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

| | | |
|---|---|---|
| **MICHAEL DEAN GONZALES,** | § | |
| **Petitioner** | § | |
| | § | |
| **v.** | § | **MO-99-CA-072** |
| | § | **CAPITAL HABEAS** |
| **JANIE COCKRELL, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| **Respondent** | § | |

<u>**ORDER GRANTING RESPONDENT'S PARTIAL SUMMARY JUDGMENT AND**</u>
<u>**RECOGNIZING RESPONDENT'S NOTICE OF ERROR ALLOWING PETITIONER A**</u>
<u>**NEW SENTENCING HEARING TO DETERMINE IF A LIFE OR DEATH SENTENCE**</u>
<u>**SHOULD BE IMPOSED IN THIS CASE**</u>

BEFORE THE COURT are Petitioner Michael Dean Gonzales' ("Petitioner") Application

for Writ of Habeas Corpus by a Person in State Custody filed pursuant to Title 28 U.S.C. § 2254

("federal Habeas Application"), Petitioner's Supplemental Petition for Writ of Habeas Corpus by

a Person in State Custody ("Supplemental Habeas Application"), Respondent's Notice of Error and

Partial Motion for Summary Judgment, Petitioner's Reply to the State's Notice of Error,

Respondent's Post-Trial Brief and Petitioner's Response to Respondent's Post-Trial Brief.[1]

**Facts & Procedural History**

On April 21, 1994, Merced and Manuel Aguirre, Sr., who were, respectively, 65-years-old

---

[1]After reviewing the docket sheet along with the pleadings on file, the Court noticed some
inadvertently made errors in the docketing. To clarify the record, Petitioner's Supplemental
Petition for Writ of Habeas Corpus by a Person in State Custody, filed on August 11, 2000, was
erroneously entered as an Amended Petition for Writ of Habeas Corpus by a Person in State
Custody and document number 34, what appears to be an exact duplicate of document number
33, was erroneously entered as Petitioner's Amended Reply to the State's Notice of Error on
December 21, 2000.



and 73-years-old, were at home and by all accounts doing what they normally do. That is, both were enjoying the simple tasks which are the benefits of retirement and at the same time, Manuel was recovering from major heart surgery which was done just a month earlier.

In the midst of their uneventful evening, probably between 6 p.m. and 8 p.m., or at least before their adult son attempted to call them on or about 9:20 p.m. on that same night, someone, possibly accompanied by others, entered the Aguirre home through a routinely used sliding door located in the front of their home. The entrance to the home was not forced based on the evidence found by the Odessa Police Department and entry appears to have been made for the purpose of taking various property from their home. It appears that once the perpetrator gained entry, he immediately sought to murder the Aguirres. Manuel was killed in his recliner and Merced was killed in the kitchen. The evidence reflects that the Aguirres attempted to fight off the assailant, but were overwhelmed. The blood spatter evidence further indicates that during the murders, Merced stayed in the kitchen while Manuel was killed in his chair. On that day, it was discovered that the intruder took several items, including a VCR that needed repair, part of a stereo system, pistol with case, purse and a 35 millimeter camera and left behind two dead bodies and a well-contained murder scene whose blood was concentrated near the victims mostly in an impeccably kept home.[2]

Almost immediately, the investigation led the police to several suspects. Among them, Petitioner, who was the Aguirre's next door neighbor to their immediate right, another neighbor, Rito Suniga, Jesse Perkins and Daniel Lugo. These individuals were found to possess some of the items taken from the Aguirre home the night they were murdered and to be Petitioner's close acquaintances

---

[2]The Court viewed the videotape, submitted as State's Exhibit Number 16, which gave an overview of the blood spatter evidence, stab wounds, murder scene, and victim's and Petitioner's neighborhood.

by virtue of their membership in the gang, "Homies Don't Play," that Petitioner allegedly led while being on parole status.[3]

The day after the murders, on April 22, 1994, the Aguirre's only son that lives in Odessa, Texas, Manuel, Jr., went over to their home at approximately 9:00 a.m. because his parent's telephone continued to ring busy.[4] Upon arrival, nothing out of the ordinary was noticed, except that the front side sliding door had been left open. The son entered his parent's home and found his father dead in his recliner and his mother on the kitchen floor. Both had been stabbed repeatedly. The son first tried to call 911 from the house, but both telephones were off the hook and he could not get a dial tone. Given his emotional state after seeing his parents this way, he had not yet noticed the missing items before rushing over to a neighbor's home to call 911. It was after calling 911 and his wife, that the son noticed that the VCR was missing and then most of the items that were missing were assessed as such.

The Emergency Medical Technicians, Odessa Fire Department and the Odessa Police Department arrived almost immediately. After the Aguirres were declared dead, Sergeant Snow Robertson ("Robertson") was immediately assigned as the chief investigator/detective.[5]   Officer

---

[3]For reasons that remain unclear, the only suspect indicted by the grand jury was Petitioner and it is unclear if the evidence against the others was ever provided to the grand jury.

[4]The Aguirres raised several sons and had several grandchildren.

[5]Sergeant Robertson was selected to lead the investigation because, at the time, he was the Odessa Police Department's representative on the Metro Homicide Unit which was a team of local law enforcement officers that worked strictly on homicides, but who would be assisted by those in their respective departments. More specifically, Robertson was chosen as a member of the Metro Homicide Unit because the murders took place at 220 Schell Street which is within the city limits of Odessa, Ector County, Texas.

Greg Bowers, the first officer on the scene, immediately secured the scene by taking watch of the backyard for what eventually amounted to nine and a half hours. During this time Officer Bowers did not observe anything unusual in the backyard though he did not conduct a formal investigation of the premises having been assigned to secure the scene only. Robertson was also assisted in securing the crime scene by Shane Lynn Callender, a detective corporal, who got everyone out of the residence, helped canvass the Aguirre neighborhood and interviewed witnesses as deemed necessary by the Unit.

An autopsy, conducted the following day by Dr. Sparks Veasey, a forensic pathologist, determined that Manuel was stabbed eleven times with a single-edge knife while sitting in his recliner. According to the blood spatter expert Rick Pippins, used by the State, Manuel was attacked first and overcome quite quickly. Dr. Veasey further testified that Merced received stab wounds too numerous to count and had been "basically butchered." She further had numerous defensive wounds to her hands and forearms indicating she "fought valiantly for her life." Merced was attacked while she was standing, but she continued to fight even after she had fallen to the kitchen floor. Dr. Veasey further testified that the stab wounds were different for each victim, in part, because Manuel's appeared to be more deliberate and focused while Merced's varied.

On the same day that the autopsies were being done, Petitioner was taken into custody for questioning by the Odessa Police Department.[6] Shortly thereafter, between 3:20 p.m and 3:30 p.m., within sixteen to eighteen hours of discovery of the bodies of the Aguirres, Bret Lambert and

---

[6]The instant discussion about the luminal testing was never raised at trial. The following is from the testimony of Officer Brett Lamber and Sergeant Harold Thomas at the Motion for New Trial hearing held to determine whether the prosecution failed to turn over exculpatory evidence to Petitioner. The claim was denied by the trial court and again, in the Texas Court of Criminal Appeals.

Sergeant Harold Thomas conducted a luminal test of Petitioner.  A luminal test consists of the use of a chemical compound that fluoresces when it comes into contact with any traces of blood, including a surface which has had blood on it but which has been washed.  It is very difficult for someone to clean themselves to such a degree that a luminal test would not glow in the area which has had blood.  The test will luminesce even when there were only small amounts blood on the area. This compound is sprayed onto the surface which has contacted blood.  The subject is then examined with the light off to determine whether or not any trace of blood exists on the areas examined.  The luminal substance was sprayed from the tips of Petitioner's fingers all the way up his arms to his shoulders, as well as on his shoes.  The lights were then turned off and Petitioner was viewed.  Both officers examined Petitioner closely and the only area that fluoresced on Petitioner was at the crook of his arm, where blood had been drawn from him shortly before.  In a report, the results were documented by Officer Lambert as "inconclusive," but at a Motion for New Trial Hearing, he and Officer Thomas said, "negative" would have been more accurate.[7]

Again, Petitioner was a suspect early on in the investigation.  Prior to the instant crime, the police had put a "close patrol" on the victims' residence due to partying and late-night activity in 1991 apparently caused by Petitioner whose house was just across a five-foot wide alley.  The son testified that the Aguirres would occasionally help Petitioner and his family financially.  However, the Aguirres stopped aiding Petitioner directly. They were apparently afraid of Petitioner. The police also noted a blood transfer stain on the camper parked in the alley between the doors of the two homes and that the dirt alley had been recently swept "very clean."  Someone had called

---

[7]Attorney Gary Garrison, 1st chair in this case, had seen the report according to his testimony at the Motion for New Trial Hearing so the report was in the file. As mentioned in Footnote 6, the report was not used by either side at trial.

Crimestoppers and told police that she saw Petitioner sweeping this area when the crime approximately took place. The police discovered red peppers both under Merced's body and next to Petitioner's back door.[8]  A bowl of these peppers were also discovered later that same day from Petitioner's refrigerator during an evidentiary search.

Linda Olivarez, one of Petitioner's acquaintances, testified that on the night of the murders, Petitioner, his wife and child came by her home at about 10:15 p.m. Petitioner had brought with him a white plastic bag which he left outside by the witness' front gate. Petitioner then left with a man who drove up in a truck. Petitioner returned shortly thereafter. As they were leaving, he asked his wife to get the white bag.

Four or five days later, Linda and her husband, Julian, were approached by Petitioner who wanted to know if they wanted to buy a microwave. Julian told Petitioner that he would have to see it first, so Julian, Linda and Petitioner went back to his home. When they arrived, Petitioner showed them that he also had a VCR, a camera and a stereo for sale. Linda and Julian purchased the microwave, the VCR and a stereo. Julian testified, too. He said Petitioner acted "a little bit nervous" when he was selling them the items. Petitioner also showed Julian a .22-caliber gun with a white handle, but told him it was not for sale because he was keeping it for himself. Petitioner then said, "they are on to me." When Julian asked what he meant, Petitioner responded, "[n]o, I can't tell you." After Linda and Julian took the items to their home, Petitioner came and took back the stereo because they had not paid for it yet and Petitioner had already sold it to someone else. The stereo was later recovered from another friend of Petitioner's, Daniel Lugo. Lugo stated that he obtained

---

[8]Robertson testified that these peppers were not native to Texas and were unique to a certain area in Mexico. These peppers could not be found in any of the local stores.

it from Petitioner. The gun, which Petitioner said he wanted to keep, was recovered from one Delia Sanchez who testified that she bought it from Petitioner. All items were identified as those taken from the Aguirre residence and Petitioner's fingerprint was found on the back of the stereo. Some empty shell casing was found in a box at Petitioner's house, during the evidentiary search, was identified as having been fired from Manuel Sr.'s .22-caliber gun.

The day after the murders, additional evidence was obtained. One Sara Cheney, a neighbor to the victims and Petitioner, found Manuel Sr.'s keys and a paper with his name on it in front of the dumpster by their homes. After searching the same area that same day, the police discovered Merced's purse including her identification and the cover for the VCR. The dumpster was located between Petitioner's and the Olivarez homes. Walking from Petitioner's home to the Olivarez home, one would find the dumpster along the way.

Petitioner was arrested on May 7, 1994, or 16 days after the murders. When he was arrested, Petitioner had two teardrops tattooed on his face. According to Robertson, these tattoos are a gang sign signifying the number of people someone has killed. Petitioner was in a gang called "Homies Don't Play." Upon a further search of Petitioner's residence, authorities also found a single-edge knife that Dr. Veasey testified was consistent with the wounds present on Manuel and with some of the wounds inflicted upon Merced. Dr. Veasey further testified that while he could not rule out the possibility that Merced was murdered with multiple weapons, the recovered knife was consistent with causing all the wounds to both victims.

On this same day, despite the arrest, police continued their investigation. Officer Thomas

interviewed Daniel Lugo ("Lugo"), another suspect in the case.[9]  Thomas wrote the following about

Lugo's interview,

> I went into the interview room and began talking to him (Lugo).  He told me Michael
> Dean Gonzales had given him the stereo system that came from the Aguirre
> residence.  He told me that he had it in his residence.  *Daniel Lugo then stood up in*
> *the interview room and started saying he did kill the Aguirres over and over. He had*
> *placed both his hands over his ears and was squeezing his head when he was saying*
> *this over and over.*[10]

While Petitioner was incarcerated at the Ector County Detention Center ("police

department"), Robertson and Officer Sanders, a Texas Ranger, talked to him about the murders.

After the officers finished talking to Petitioner, jail guard Charles Kenimer ("guard") was summoned

to take him back to his cell.  The guard testified that the officers and Petitioner appeared upset after

the interview.  The guard further testified that Petitioner confessed to the crime after he said, "[b]oy

you really got these officers upset.  I don't know what you said."  Petitioner responded in Spanish,

"[t]hey are trying to pin this rap on me this murder rap on me.  They can't do it.  They don't have

any evidence."  The guard also testified that Petitioner further said, "[a]lthough I did it, you know,

but they don't have nothing to go on."  The guard said he made the statement to make sure the

---

[9]Robertson questioned Lugo, too, without obtaining a confession and received hearsay
information about a confession that Lugo made to Jesse Perkins, but none of that evidence would
have been admissible at Petitioner's trial to rebut or impeach Thomas' report about Lugo's
confession.

[10]At the evidentiary hearing, Thomas was questioned about Lugo's statement that seemed
to be a confession. Thomas testified that Lugo never confessed and that his original report was
inaccurate so he corrected it after he noticed at a pretrial hearing that the report misstated what
Lugo actually said.  According to Thomas, Lugo actually said, "he did NOT kill the Aguirres
over and over."

prisoner stayed calm and to neutralize any situations that might arise pursuant to policy.[11]

On July 18, 1994, Petitioner was indicted for Capital Murder charging him with intentionally or knowingly murdering Merced and Manuel Aguirre, Sr. on April 21, 1994. Petitioner was appointed Attorney Gary Garrison as his attorney.[12] Petitioner was 20 years old at the time. There were several pre-trial hearings held and several conferences for the purpose of limiting the jury panel to eligible members of the community.

After several continuances, jury selection commenced on November 27, 1995. By December 4, 1995, a jury had been selected. On December 5, 1995, the trial on the merits commenced and ended just two days later on December 7, 1995. On that day, Petitioner was convicted of Capital Murder for intentionally or knowingly murdering two people during the same criminal transaction by a jury in the 358th District Court of Odessa, Ector County, Texas ("trial court"). Subsequently, for two days, the jury heard evidence from the State and Petitioner concerning punishment.

During the punishment phase, the State revisited the facts surrounding the murders, presented

---

[11]Evidence introduced at the evidentiary hearing shows that there is no such policy and in fact, that the jail guards are discouraged from engaging in such an exchange. At the evidentiary hearing, the guard denied making a statement that resulted in Petitioner confessing to him and his testimony about his exchange with Petitioner at the police department seven years before in 1994 was entirely confusing and it was clear that in 2001 he did not remember his 1995 testimony either.

[12]Eventually, the trial court also appointed Benny Lowe. Attorney Garrison was appointed first chair and his office mate and friend, attorney Lowe would be second chair. Neither attorney had tried a capital murder case before. Attorney Garrison had been county and district attorney for Odessa, Ector County, Texas, but acted as the administrator only. He tried a handful of misdemeanor cases, but never felony cases. Attorney Lowe had tried some felony cases, but had experienced problems in his practice, including alcoholism and the forging of his clients' signatures, which resulted in suspensions of his license on more than one occasion. Attorney Lowe was chief counsel during trial and attorney Garrison conducted the sentencing phase of trial.

various jail and law enforcement officials who testified that Petitioner had a bad reputation for being peaceful and law abiding and was not a model prisoner.  The State also presented evidence of Petitioner's lengthy juvenile history, his gang history, his adult criminal record, and evidence that he made a gang sign to a television camera at a pre-trial hearing.  Finally, Dr. Walter Quijano, a clinical psychologist, testified, based upon a hypothetical that substantially tracked the facts of the instant case, and based on other factors, including Petitioner's race, that Petitioner would be a future danger to society.

Petitioner's evidence at the punishment phase consisted of only two experts.  Dr. Sam Brinkman, a neuropsychologist, testified that Petitioner had substantial organic brain damage due to several major head injuries from early childhood and that his memory, ability to learn, attention span and communication skills were impaired due to the damage.  Dr. Mark Cunnigham, a clinical psychologist, testified that Petitioner suffered from a severe emotional disorder stemming from physical abuse at the hands of his father, that he had watched his father physically abuse his mother, and that his father encouraged him to begin using drugs and alcohol when he was just six years old.  Dr. Cunnigham further testified about the painful relationship Petitioner has had with other family and acquaintances.  After Petitioner's father left to start a new family in Oklahoma, the mother was neglectful and the older sister was charged with caring for him mostly.  Dr. Cunningham also testified that Petitioner was bullied at home by his parents and his friends stemming from his learning disability.  Petitioner was especially bullied when he was entering kindergarten because he still soiled his clothes in that significant childhood training had not set in.  Dr. Cunnigham testified that Petitioner was not a future danger to society, especially in the context of being segregated in prison.

On December 8, 1995, the jury was asked to consider punishment. The jury was read the Jury Charge on Punishment which states, in part, that a "sentence of life or death is mandatory on conviction for Capital Murder. In order for the Court to assess the proper punishment, two questions or special issues are submitted to [the jury]." Special Issue No. 1 asks,

> "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?"

Special Issue No. 2 asks,

> "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?"

The jury was instructed to answer these questions with a simple yes or no. Under law, a "no" answer as to both special issues has to be unanimous and a "yes" answer to either special issue requires an agreement of 10 or more jurors. On December 8, 1995, the jury found the special issues on punishment against Petitioner. Accordingly, the trial court assessed the death penalty.

An automatic appeal followed and the Texas Court of Criminal Appeals upheld the conviction and sentence on June 3, 1998. Petitioner then filed a Motion for Rehearing and it was denied by this same court on September 16, 1998 without an opinion.

On October 12, 1998, Petitioner filed an Application for Writ of Habeas Corpus ("state habeas application") with the trial court. On February 11, 1999, the trial court adopted the State's proposal to recommend the Petitioner's only state habeas application be denied without a hearing or specific conclusions of law about the merits of his claims.

On March 10, 1999, the Texas Court of Criminal Appeals adopted the trial court's

11

recommendation and denied petitioner's state habeas application.

On May 27, 1999, petitioner's state habeas corpus counsel filed an unauthorized federal petition for a writ of habeas corpus and a request to be appointed to represent him in the instant action. This court denied his request and appointed undersigned counsel to represent Petitioner.

On July 6, 1999, this Court granted Petitioner's Rule 41(a) Motion to Dismiss the unauthorized federal Habeas Application. On January 10, 2000, Petitioner filed the instant federal Habeas Application. Therein, Petitioner raised six (6) claims for relief : 1) Prosecutor denied Petitioner due process by concealing the exculpatory negative result of a test for blood on his hands and arms; 2) Petitioner was denied effective assistance of counsel on direct appeal because his attorney did not appeal the erroneous ruling on the winning *Brady* claim in his Motion for New Trial; 3) Petitioner was denied effective assistance of counsel at the guilt and punishment stages of his trial; 4) Petitioner's unwarned confession to a jail guard was obtained in violation of his Fifth Amendment right against self-incrimination; 5) Petitioner was denied due process because the prosecutor knowingly failed to correct a jail guard's false testimony that Petitioner spontaneously confessed to him; 6) Prosecutor denied Petitioner due process by knowingly allowing a police officer to give the jury the false impression that his tear drop tatoos meant that he killed two people.

More specifically, the ineffective assistance of counsel at trial claim provides that counsel's performance was deficient because he failed to: 1) introduce Daniel Lugo's confession; 2) use evidence that heavily impeached the testimony of the jail guard who claimed that Petitioner confessed to him; 3) challenge Detective Robertson's opinion about the meaning of Petitioner's tatoos; 4) timely object to inadmissable evidence that Petitioner's mother hid knives and a meat cleaver from him because she feared that he would murder his family; 5) object to inadmissible

evidence of an extraneous forced entry into the victims' house; 6) exclude inadmissible evidence of Petitioner's leadership of a street gang; 7) avoid opening the door to inadmissible evidence that Petitioner's friend suspected that he could be guilty of the Capital Murder because he served time in prison and was involved in street gang activity; 8) object to prosecutor's improper closing arguments; and 9) deliver an effective summation.

On August 11, 2000, Petitioner filed a Supplemental Writ for the purpose of adding a seventh claim: "[t]he State's psychological expert's testimony that race is an indicator of future dangerousness offends equal protection and the Eighth Amendment's arbitrary-and-capricious doctrine."

On October 26, 2000, Respondent filed his Notice of Error and Partial Motion for Summary Judgment with Brief in Support.  In the Notice of Error, Respondent concedes that the State's psychological expert's testimony violates "Gonzales' Eighth and Fourteenth Amendment rights" and that "Gonzales is entitled to a new sentencing hearing." Respondent also asks that the Court not consider the issues that pertain to the punishment phase given that the confession of error eliminates the need to reach any other punishment phase issues. In the Partial Motion for Summary Judgment, Respondent urges the Court to dismiss most of the claims because he is of the opinion that Petitioner has failed to exhaust state court remedies.

On December 21, 2000, Petitioner filed his Reply to the State's Notice of Error and Partial Motion for Summary Judgment ("Reply").  In his Reply, Petitioner addresses the merits of Respondent's Partial Motion for Summary Judgment and avers that all the ineffective assistance of counsel claims may be considered by this Court under § 2254(e). In the alternative, Petitioner argues that if this Court finds Petitioner's ineffective assistance of counsel claims are procedurally barred,

the claims still warrant review because there was a miscarriage of justice at the innocence/guilt phase of his trial.

On December 5, 2000, the state trial court held a hearing to consider whether or not to set an execution date. On January 3, 2001, the state trial court decided that it did not know of any legal reasons not to pronounce a date of execution and set the execution "before the hour of sunrise on April 21, 2001."

Two days later, on January 5, 2001, Respondent filed his Advisory of Non-Opposition stating that the State of Texas does not oppose an order staying the scheduled execution pending resolution of the matters raised before this Court.

On February 8, 2001, after pursuing the matter with the Texas Court of Criminal Appeals, Petitioner filed his Application for Stay asking this Court for a stay based upon the Texas Attorney General's confession that reversible constitutional error had occurred during the sentencing phase of the trial.

On March 15, 2001, the Court held an evidentiary hearing on some of the issues raised herein.  The Court heard from witnesses and the arguments of counsel and at the conclusion of the hearing entered an Order staying the execution set for April 21, 2001.

On June 25, 2001, Petitioner submitted Petitioner's Post-Hearing Brief, on October 1, 2001 Respondent filed her Post-Trial Brief and Petitioner's Response to Respondent's Post-Trial Brief was filed on October 9, 2001.  All of these post-hearing briefs focused on the evidence presented at the evidentiary hearing and the finer points of habeas law about procedural bar concerns and applicability of the standard of review.

The execution remains stayed.

## Standard on Motion for Summary Judgment

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party that moves for summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party fails to meet this burden, the motion must be denied, regardless of the nonmovant's response." *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). If the movant does meet this burden, however, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See, e.g., Celotex Corp.*, 477 U.S. at 324. "If the nonmovant fails to meet this burden, then summary judgment is appropriate." *Tubacex,* 45 F.3d at 954.

## Standard of Review in State Habeas Cases

The standard for reviewing habeas applications by state prisoners is codified in Title 28 U.S.C. § 2254(d) which reads:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Whereas the first subsection, (d)(1), specifies distinct standards of review governing questions of law and mixed questions of law and fact, the second subsection, (d)(2), specifies the standards of review governing questions of fact. *Drinkard v. Johnson*, 97 F.3d 751, 767-768 (5th Cir. 1996), overruled in part on other grounds, *Lindh v. Murphy*, 521 U.S. 320 (1997).

*I. Section 2254(d)(1)*

"When reviewing a pure question of law, a federal court may grant habeas relief only if the state court decision was 'contrary to' clearly established federal law, as determined by the Supreme Court." *Carter v. Johnson*, 110 F.3d 1098, 1103 (5th Cir. 1998)(referencing *Drinkard v. Johnson*, 97 F.3d at 767-768). Very recently, the United States Supreme Court ("Supreme Court") looked to the commonly understood definitions of "contrary" to explain what Congress meant by "contrary to" in Section 2254(d)(1). *See Williams v. Taylor*, 529 U.S. 362, 364 (2000). The Supreme Court concluded that "2254(d)(1)'s first clause must be interpreted to mean that a federal habeas court may grant relief if the state court (1) arrives at a conclusion opposite to that reached by this Court on a question of law or (2) decides a case differently that this Court has on a set of materially indistinguishable facts." *Id.* at 1498.

When reviewing mixed questions of law and fact, this Court may only grant habeas relief if the state court decision "involved an unreasonable application of" clearly established federal law as announced by the Supreme Court. *Carter*, 110 F.3d at 1103. "Unreasonable application" specifically means this Court "may grant relief if the state court identifies the correct governing legal principle

from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 365. Most importantly, the Supreme Court clarified that "unreasonable" is broader than "incorrect" or "erroneous" which requires that this Court must consider whether the "relevant state-court decision applied clearly established federal law erroneously or incorrectly," and if the application is unreasonable. *Id.*

Finally, "clearly established Federal law" refers to Supreme Court holdings "as of the time of the relevant state-court decision." *Id.*

## II. Section 2254(d)(2)

While it is clear that the Courts agree § 2254(d)(2) involves a pure question of fact, the Courts have not provided guidance on how to gage the "unreasonable determination of the facts." *See Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000) (citations omitted); *see also Williams*, 529 U.S. at 375. The intent of 2254(d)(2) is like 2254(d)(1)'s in that, "it bolsters [the Supreme Court's] conviction that federal habeas courts must make as the starting point of their analysis the state courts' determinations of facts, including that aspect of a 'mixed question' that rests on a finding of fact." *Williams*, 529 U.S. at 375 (Stevens, J., concurring).

## Discussion

## I. GUILT/INNOCENCE PHASE

### A.    Whether the Prosecutor Withheld Exculpatory Evidence from Petitioner

The first issue before the Court is whether the prosecution withheld exculpatory evidence from Petitioner in violation of the Due Process Clause by concealing the results of a test for blood on his hands and arms. The prosecution has an affirmative duty to disclose favorable evidence under

the Due Process Clause if the evidence is material to the defendant's guilt or punishment. *Brady v. Maryland*, 387 U.S. 83 (1963). "[E]vidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995)(citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995))(holding that inconclusive polygraph test of potential witness and co-defendant, which was inadmissible under California laws, not evidence at all and even if it were, the result at trial would not have been different). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of trial.'" *Kyles*, 514 U.S. at 434 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In the instant case, Petitioner alleges that the prosecution violated his due process rights by not disclosing the negative result of the luminal test that was done on his person, arms to shoulders including fingers and his feet, approximately 16 to 18 hours after the murders were discovered. In supporting his claim, Petitioner avers that the negative result of the luminal test is favorable to his case because it contradicts the prosecution's theory that he viciously killed Mr. and Mrs. Aguirre leaving a very bloody scene because no blood, except a small dot on the crook of his arm from the police's withdrawal of a blood sample, was on his person. Moreover, Petitioner claims that the prosecutor had the favorable test evidence by constructive possession since he had the two reports belonging to Officers Lambert and Thomas who performed the luminal test. Further, Petitioner claims that the negative test result was material and dictates that he is entitled to a new trial under

18

the Due Process Clause because there is a reasonable probability that the negative result of the luminal test would have changed the jury's finding at the guilt stage that he caused the death of both victims.

Respondent counters that it is incredible for the Petitioner to argue that the prosecution failed to disclose the negative test result to him when he was present at the time of the luminal testing and saw the results for himself. In addition, Respondent avers that even assuming Petitioner had no idea what luminal testing implies, his attorneys had access to an open file that contained the reports with the results. Respondent also states the results are not exculpatory for several reasons, including the facts that (1) Petitioner had bathed since the time of the murders, (2) a seasoned officer found the test results questionable on various occasions, (3) Officer Lambert who conducted the luminal testing had only done it once before and (4) an experience technician with the Texas Department of Public Safety said he was unfamiliar with the use or accuracy of the luminal testing on human skin.

Petitioner attempted to contradict whether the test result was accurate and favorable by having forensic expert, Max Courtney, perform an experiment using his own blood on his own skin then scrubbing intensely with various soaps to remove the blood he had applied. Petitioner's informal experiment showed that blood can be detected on human skin because expert Mac Courtney's arms fluoresced blue as depicted in the photographs introduced at the evidentiary hearing. Respondent contested the results and challenged the expert's opinion because the experiment was not performed under a controlled environment and because the luminal powder can react to soaps as well as blood.

After careful consideration of all the facts and pleadings, the Court finds that the prosecutor was under an obligation to reveal exculpatory evidence even though the defense attorney's had

access to the prosecution's entire file and even though Petitioner was present when the luminal test was administered and results were immediately available to him in his presence.  The obligation stems from the "First-Pretrial Order(s)" entered by the trial court on August 3, 1994.  Specifically, the Order requires the District Attorney to "allow inspections of all the following, to the extent that they exist and are in the possession or control of, or accessible to, the District Attorney."  As part of the discovery that the District Attorney was required to disclose was, "Exculpatory Evidence: Descriptive content of all evidence not otherwise covered elsewhere in these orders, that is favorable to the accused on the issue of guilt or innocence, or that is inconsistent with the guilt of the Defendant."

The evidence of the negative test result fits squarely within the trial court's definition of what the District Attorney should have brought to Defendant's attention as part of the discovery before trial.  The Assistant District Attorney, during a pretrial hearing, informed the trial court of its open file, which the Court applauds, but then he failed to make sure that the defense knew of any possible exculpatory evidence.   While the parties have disagreed on whether or not the evidence is exculpatory based on the "inconclusive" label put on the results initially, it seems that all the parties including Officer Lambert at the Motion for New Trial hearing conceded that the accurate characterization of the test result would be "negative" rather than "inconclusive."  The question remains then, whether the negative test result is material because there is a reasonable probability that the negative result of the luminal test would have changed the jury's finding at the guilt stage that he caused the death of both victims necessitating a new trial.

The claim was considered , though almost tacitly, by the Texas Court of Criminal Appeals who denied the state habeas application after adopting the trial's court's findings of fact and

conclusions of law which held that another hearing was not necessary since a Motion for New Trial Hearing had already been held fully litigating the issue and the claim as a matter of law.  There were no express factual findings by the trial court or Texas Court of Criminal Appeals and it appears that these courts relied on the factual findings and credibility decisions made at the Motion for New Trial hearing.

The parties agree that the instant claim must be reviewed as a mixed question of law and fact. The parties disagree about the facts that apply. Petitioner says that the claim warrants *de novo* review because the facts cannot be reconstructed where their rulings were "conclusory and silent."  *See Perillo v. Johnson*, 79 F.3d 441, 469 (5th Cir. 1996).  What happened at the habeas level and at the Motion for New Trial hearing are more consistent with the holding in *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) that implicit factual findings and credibility choices are entitled to a presumption of correctness on federal habeas review.  *See Monroe v. Collins*, 951 F.2d 49, 53 (5th Cir. 1992) ("[c]onstruing the testimony in the light most favorable to the state, as it is appropriate for us to do in light of the denial of Monroe's motion for new trial ...").

The Court finds that the decision of the Texas Court of Criminal Appeals was objectively reasonable because the claim cannot be granted under federal law.  The introduction of the negative result of the luminal test would not have changed the jury's finding at the guilt stage.  Very simply, Petitioner could have worn clothes that concealed his person and disposed of any bloody clothing prior to entering his home.  In other words, evidence that there was no blood on his person 16 to 18 hours after the bodies were discovered in no way negates evidence that implicates him.  Moreover, the bloody hand-print found by Mrs. Aguirre in the kitchen was not used as evidence against Petitioner though there was a belief that it could have been the perpetrator's.  The hand-print could

have been the victim's or it could belong to a second assailant as is strongly suggested by the evidence and alluded to at trial by both parties.  Furthermore, after reviewing the evidence of the murder scene, the Court is convinced that the blood was surprisingly isolated and not the bloody scene described by Petitioner in support of his *Brady* claim.  Therefore, after giving due deference to the state court findings, Petitioner's claim that his due process rights were violated when the District Attorney failed to disclose exculpatory evidence must fail.

### B.      *Whether Petitioner Was Denied Effective Assistance of Counsel at the Guilt and Penalty Phases of his Trial*[13]

Generally, the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of counsel was announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984).  There, the Supreme Court held that "[t]he bench mark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686; *see also Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985).  To facilitate the inquiry, the Supreme Court established the following two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not

---

[13]The Court will not adjudicate Petitioner's claim that he was denied effective assistance of counsel on appeal, which he raised as his second claim, as he has withdrawn the claim admitting unexhaustion.  Moreover, given the Notice of Error filed by Respondent concerning the penalty phase, the Court will not adjudicate all of the issues Petitioner raises about the punishment phase as there is no need to do so even though it can.  *See, e.g., Vanderbilt v. Collins*, 994 F.2d 189 (5th Cir. 1993)(district court granted relief on two related claims that required a new sentencing trial and a third claim that barred the State from seeking death penalty again); *Williamson v. Reynolds*, 110 F.3d 1508 (10th Cir. 1997)(district court granted relief on several claims that required a new sentencing trial).

functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
Second, the defendant must show that the deficient performance prejudiced the
defense. This requires showing that counsel's errors were so serious as to deprive the
defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. In so doing, a convicted defendant must carry the burden of proof and

overcome a strong presumption that the conduct of his trial counsel falls within a wide range of

reasonable professional assistance. *See Strickland*, 466 U.S. at 687-91; *Belyeu v. Scott*, 67 F.3d 535,

538 (5th Cir. 1995). The courts are extremely deferential in scrutinizing the performance of counsel

and make every effort to eliminate the distorting effects of hindsight. *See Lockhart v. Fretwell*, 506

U.S. 364, 372 (1993); *Burger v. Kemp*, 483 U.S. 776, 789 (1987); *Strickland*, 466 U.S. at 689; *Green*

*v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997). It is strongly presumed that counsel has rendered

adequate assistance and made all significant decisions in the exercise of reasonable professional

judgment. *See Strickland*, 466 U.S. at 690 and *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir.

1992). An attorney's strategic choices, usually based on information supplied by the defendant and

from a thorough investigation of relevant facts and law are virtually unchallengeable. *See Boyle v.*

*Johnson*, 93 F.3d 180, 187-88 (5th Cir. 1996).

Furthermore, in order to establish that he has sustained prejudice, the convicted defendant

"must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Strickland v. Washington* 466 U.S. at 694;

*Cantu v. Collins*, 967 F.2d 1006, 1016 (5th Cir. 1992). In addition, analysis of the second or

"prejudice" prong of the *Strickland* test must include examination of whether counsel's deficient

performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair. *See*

*Lockhart v. Fretwell*, 506 U.S. 364, 368-73 (1993) and *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart*, 506 U.S. at 372. Finally, prejudice is measured by current law and not by the law as it existed at the time of the alleged error. *Westley v. Johnson*, 83 F.3d 714, 723 (5th Cir. 1996)(citing *Lockhart v. Fretwell*, 506 U.S. at 372-73).

In summary then, in order to prevail on a claim of ineffective assistance of counsel generally, a movant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Darden*, 477 U.S. at 184; *Williams v. Collins*, 16 F.3d at 631; and *United States v. Bounds*, 943 F.2d 541, 544 (5th Cir. 1991). A failure to establish either deficient performance or prejudice under that test makes it unnecessary to examine the other prong. *See Strickland*, 466 U.S. at 700 and *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).

In the instant case, Petitioner complains that he was denied the effective assistance of counsel in this very important case because counsel: (1) failed to introduce Daniel Lugo's confession; (2) failed to impeach the jail guard to whom he allegedly confessed; (3) failed to rebut Detective Robertson's testimony regarding the meaning of Petitioner's teardrop tattoos; (4) failed to timely object to a statement made by Petitioner's mother regarding the knives found at her residence; (5) failed to object to evidence that Petitioner had previously broken into the victim's home as allegedly alluded to by the victims' son; (6) failed to object to evidence that Petitioner was a leader of a street gang; (7) solicited evidence that Petitioner had previously been to prison; (8) failed to argue certain

matters during closing remarks; and (9) failed to object to the prosecutor's closing remarks regarding (a) the law of parties, (b) the weapon seized from Petitioner's residence; (c) the spontaneity of Peitioner's alleged confession; (d) his experience as a prosecutor in other cases; and his interaction with victims and members of the community.[14]

Respondent contends that five of the nine claims are procedurally barred as unexhausted: 1) trial counsel failed to impeach jail guard Kenimer; 2) trial counsel failed to introduce Daniel Lugo's "confession"; 3) trial counsel introduction of evidence that Petitioner had been to prison before; and 4) trial counsel failed to object to the prosecution's closing comments regarding the prosecutor's experience and interactions with the victims and community; 5) trial counsel failed to make specific comments during Petitioner's closing argument. Respondent argues that these claims are procedurally barred under 28 U.S.C. § 2254(b)(2)(A) because the "substance" of these claims were not "fairly presented" to the state courts. In addition, Petitioner avers that the fundamental miscarriage of justice exception does not apply because Petitioner must claim actual innocence and this he has yet to do.

Petitioner makes an extensive reply to the exhaustion challenge. He avers that the Texas Court of Criminal Appeals has considered a global ineffective assistance of counsel claim and as such, has considered each of these claims on the merit citing *Vela v. Johnson*, 708 F.2d 954 (5th Cir. 1983). In addition, Petitioner says that even if the Court does not agree that couching the claims in global terms allowed for adjudication of the specific claims of ineffective assistance of counsel raised herein, it would be futile to send Petitioner back to state court to exhaust each individual claim

---

[14]The Court is not considering Petitioner's claim that trial counsel failed to object to the prosecutor's closing argument at the punishment phase regarding his decision to seek the death penalty given Respondent's Notice of Error.

of ineffective assistance of counsel and that the claim must be reviewed to correct a miscarriage of justice.

As a preliminary matter, the Court finds that the five claims challenged by Respondent are indeed unexhausted. The global allegation raised at the state level does not save this Petitioner like it did in *Vela*. In *Vela*, the Fifth Circuit held that "even the new allegations had been exhausted because the state habeas court evaluated counsel's performance on the basis of the record as a whole." *Thomas v. Collins*, 919 F.2d 333, 335 (5th Cir. 1990). The facts are critically different in this case from *Vela*. The Texas Court of Criminal Appeals in considering the claims on direct appeal was very careful to address them individually and never addressed a global allegation. In addition, on state habeas review, the Texas Court of Criminal Appeals did not say anything at all about the raised claims so it clearly did not consider a global assertion of ineffective assistance of counsel or go beyond what was raised. In the end, Respondent is correct, Petitioner never "fairly presented" the "substance" of these five federal habeas claims to the state courts as he had to do. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982)(citations omitted); *see also*, *Picard v. Collins*, 404 U.S. 270, 275-76 (1971) and *Duncan v. Henry*, 513 U.S. 364 365 (1995). Consequently, the state courts never got a chance to review these five claims so this Court cannot "review" them under 28 U.S.C. § 2254.

The next question then is whether a fundamental miscarriage of justice has occurred allowing for review despite unexhaustion since both parties agree that it would be futile to consider dismissal of these five claims to allow exhaustion before the Texas Court of Criminal Appeals given that one state habeas application was already filed. *See* TEX. CRIM. PROC. CODE art. 11.07(5)(a)(1)(2)(3) (Vernon 2001) (discussing requirements for filing success state habeas application in Texas). The test is whether the constitutional violation probably resulted in the conviction of one who is actually

Petitioner's tatoos that juror probably would have found that he was not guilty of the capital offense of murdering *both* of the victims.

The Court finds that Petitioner is mistaken about these facts and how they support his claim. The evidence produced at the evidentiary hearing in no way supports a finding that Daniel Lugo "confessed" though it did show that the police failed to follow some of their own most important procedures on record keeping. Also, the Court is not convinced that the guard's poor recollection of what transpired the day he talked to Petitioner at the police station is so inconsistent that a juror probably would not have found him guilty of both murders. In addition, calling the meaning of the tattoos into question probably would not create reasonable doubt about whether Petitioner killed Mr. and Mrs. Aguirre because the State never established that Petitioner did not have these prior to the date of the murders or that they had evidence he got them sometime between the date of the murders and the time his booking photo was taken. Therefore, the fundamental miscarriage of justice exception cannot apply in this case.

Before the Court addresses the exhausted ineffective assistance of counsel claims that it can consider here, it must observe that the qualifications of attorneys Gary Garrison and Benny Lowe, appointed to represent Petitioner at trial, were subjected to close scrutiny at the hearing in this matter. A real question was raised as to their experience and ability to competently represent an accused in a capital case. Since their limitations apparently were not known at the time, they secured the representation of Petitioner. Such appointments highlight, however, the reason that the Texas Legislature felt compelled to pass some recent legislation imposing strict requirements as to which attorneys can be appointed to work on a variety of criminal cases based on their qualifications. [15]

---

[15]*See generally*, TEX. CRIM. PROC. CODE ANN. art. 26.04 (Vernon 2002).

Simply put, in retrospect, neither of these attorneys should have been appointed to have a major role in this case.  Having spoken on the importance of appointing qualified counsel and the Texas legislature's acknowledgment of such,  the Court is nonetheless obligated to consider Garrison and Lowe's performance under *Strickland* and not the appointment itself as a basis for a new trial.

1.     *Counsel was Deficient, but not Ineffective for Failing to Refute the Teardrop Tattoo Testimony Using Expert Testimony*

Petitioner's first claim of ineffective assistance of counsel is that his attorneys failed to refute the damaging teardrop tattoo testimony of Robertson that two tear drop tattoos on Petitioner's face were a sign to other street gang members that he killed two people which was extremely damaging since it was the only physical evidence that he acted alone the night of the murders.  Respondent counters that Petitioner's claim fails because: 1) the Texas Court of Criminal Appeals reviewed the claim and did not unreasonably apply clearly established federal law; 2) the case law dictates that challenging counsel performance for not calling a witness means that Petitioner must show that the uncalled witnesses were willing and able to testify and what they might have testified to; and 3) even if an expert would have testified that the teardrop tattoos could mean a variety of things, the result would have been the same because there was no evidence that the tattoos were there before the murders on April 21, 1994 and that his mean something other than that he killed two people.

The Court is convinced that an expert would have negated Robertson's testimony and that defense counsel knew of the tattoos, but did nothing to refute, until the sentencing hearing, potentially damaging testimony about them.  The Court finds that defense counsel was constitutionally deficient because they could have easily found a witness to refute Robertson's testimony and they could have easily challenged his testimony by using other evidence.  Petitioner suggests, for example, that

defense counsel could have simply argued that between the times of the murders on April 21, 1994

and the time the booking picture was taken on April 22, 1994, he did not have enough time to go out

and get the tattoos nor was there evidence that he had done so during this time.[16]  Moreover, the

Court is of the opinion that producing recent photos of the Petitioner was a simple undertaking to

undermine Robertson's testimony and it too was not done nor is there evidence that defense counsel

made such an attempt.  Furthermore, there is no evidence that it was sound trial strategy to avoid the

subject because, as Petitioner points out, it was evidence that connected Petitioner to two murders

requiring them to refute it.

The Court further finds, however, that there is no evidence of prejudice.  Petitioner had to

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different.  *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986);

*Darden*, 477 U.S. at 184; *Williams*, 16 F.3d at 631; and *United States v. Bounds*, 943 F.2d 541, 544

(5th Cir. 1991).  Looking at all the evidence introduced against Petitioner at trial, the tattoos were

not critical to the prosecution of Petitioner for both murders.  The tattoos, as the Court sees it, were

evidence that was open to interpretation, even absent objection, concerning the murders. It was not

definitive like the fingerprint or ballistic evidence which implicated Petitioner of both murders. There

is no reasonable probability that the result would  have changed with the expert testimony or with

argument that would have refuted the assumption of what the tattoos meant and when Petitioner had

them administered to his face.  Therefore, while the Court disagrees with the state court's application

of the first prong of *Strickland*, Petitioner's first claim of ineffective assistance of counsel lacks merit

---

[16]The record reflects that a booking photo probably was not taken on that day since he
was taken in for questioning only unless the luminal testing photos that were taken reveal the
tattoos. A booking photo would have been taken on the date of arrest on May 7, 1994.

and the state court decision is objectively reasonable.

> 2. ***Counsel was not Ineffective for Failing to Timely Object to Inadmissible Evidence that Petitioner's Mother hid Knives and a Meat Cleaver Because She Feared that he Would Murder his Family***

Petitioner's fifth claim of ineffective assistance of counsel is that defense counsel was ineffective at trial when counsel objected after Robertson testified on direct examination that a meat cleaver and some knives were found hidden under a couch cushion in Petitioner's home after he was arrested and a search warrant was executed.  Specifically, the testimony was made as follows:

| | |
|---|---|
| Question: | Who led you to those knives? |
| Answer: | The criminalistics team found them. *Michael Gonzales' mother told me about them.* |
| Question: | And why were they in there? |
| Answer: | *Because she was afraid that he was going to kill her and his family.* |

After the jury heard this testimony, counsel Lowe stated the following in front of the jury:

> Excuse me, your Honor, *I was a little slow in getting on my feet on that one.  It's obviously hearsay* and it is an rather extremely wild accusation that this lady harbored this fear from her son.  I object to that answer.  I object to the conclusion that this witness has drawn.  There is no predicate for it.  There is nothing involved in this case that would cause an investigation to be made of such an allegation and I think that this statement was made simply for the purposes of showmanship in front of the jury.

Counsel Lowe then asked the trial court to strike "the last remark" that Robertson made and asked for an instruction that the jury disregard it.  The trial court granted the motion and instructed the jury not to consider "the last remark" for any purpose.  No other relief was requested.

Petitioner claims that defense counsel should have done one of two things in light of this testimony.  Counsel should have timely objected because the mother's remarks are not admissible

under any hearsay exceptions, including the state of mind exception because it was irrelevant. *See United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1983). In the alternative, as the testimony at trial was made in front of the jury, then counsel should have moved for a mistrial because of the prejudicial context of the statement and because there is always some risk that the jurors will be influenced by the testimony despite limiting instructions. *See Gray v. Maryland*, 523 U.S. 185, 190 (1998)("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored"); *see also, United States v. Wolf*, 787 F.2d at 1100 ("[L]awyers rightly mistrust instructions that tell juries to disregard what they have just heard"). After all, a mother's testimony that she fears her son would murder the family is overpowering because a parent's negative beliefs about a child are hard to ignore and because her fear tracked the allegations of the Indictment except that these victim's were not family. In short, Petitioner said the hearsay testimony prejudiced his case in two respects: 1) defeated the trial strategy that there was an accomplice because the hearsay, in essence, said he could act alone; and 2) at the guilt phase, the testimony supported a finding that his propensity to commit multiple stabbing murders was probative of future dangerousness as well as guilt.

Respondent contends that the claim lacks merit because the Texas Court of Criminal Appeals considered the claim on the merits and its decision was not objectively unreasonable. The Texas Court of Criminal Appeals, on direct appeal, found that the instant claim is unfounded because counsel did object to the testimony and the trial court instructed the jury to disregard the testimony. Respondent directs the Court's attention to *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993), which says that "juries are presumed to follow their instructions."

The Court agrees with Petitioner's account of the damage such a statement could have on a jury.[17] It is hard to imagine that a juror could simply ignore that a defendant's mother, whose son sits accused of murdering people he knew his entire life by viciously stabbing them to death with a knife, feared that her son would murder her so she hid all the knives from him. Despite the Court's concern that the statement was no doubt damaging to the Petitioner's case at trial, it must follow the dictates of § 2254 regarding review of the state court's decision. In this light, the Court does not find that defense counsel was ineffective for failing to make a timely objection or for not asking for a mistrial because the Texas Court of Criminal Appeals's decision is objectively reasonable. Therefore, Petitioner's second claim of ineffective assistance of counsel must be denied.

### 3.      Counsel was not Ineffective for Failing to Object to Inadmissible Evidence of an Extraneous Forced Entry into the Victims' House

Petitioner alleges that defense counsel was ineffective at trial for failing to object to inadmissible evidence of an extraneous offense: a forced entry into the victims' home. More specifically, Petitioner claims that counsel should have objected when Manuel Aguirre, Jr., the son of the deceased, testified at trial that his parents were afraid of Petitioner and put bars on the windows of their house. When the prosecutor asked him why his parents put up the bars, the son replied, "[w]ell, they were scared of him and they put them up because they had been broken into." Petitioner contends that the statement allowed the jury to speculate that he had burglarized the victims' home before which means that counsel should have moved to strike the answer.

In response, Respondent says the claim was addressed by the Texas Court of Criminal

---

[17]Again, the Court will not consider the claim as to the guilt phase of the trial.

Appeals, on direct appeal, and its holding is objectively reasonable.  The Texas Court of Criminal

Appeals held that the statement was not an extraneous offense because it did not implicate Petitioner.

The Texas Court of Criminal Appeals found that the son's statement about the bars on the window

and burglary were two, separate and distinct statements. Specifically, one of the son's statements was

about Petitioner, but the statement about the burglary did not implicate him. The burglary portion of

the son's testimony referred to an additional reason for placing the bars on the window and not to

a second reason that the Aguirres had for fearing Petitioner, making the son's testimony admissible.

The Court finds that counsel is not deficient for failing to object to admissible evidence, *Westley v.*

*Johnson*, 83 F.3d 714, 722 (5th Cir. 1996), and that the Texas Court of Criminal Appeals's decision

on this point is, therefore, objectively reasonable.  Petitioner's third claim of ineffective assistance of

counsel must also be denied.


### 4.   *Counsel Failed to Exclude Inadmissible Evidence of Petitioner's Leadership of a Street Gang*

Petitioner next alleges that defense counsel provided ineffective assistance of counsel at trial

because they failed to object to testimony about his leadership in the local "Homies Don't Play" gang.

Petitioner contends that there was no plausible tactical reason to allow Robertson to tell the jury that

Petitioner was the leader of the street gang and he cites a case where an El Paso attorney was held

ineffective, in part, for referring to his "bandito friends" for support. *See Craig v. State,* 847 S.W.2d

434 (Tex. App. - El Paso - 8th Dist. 1993)(counsel ineffective in part because he did not need to refer

to defendant's "bandito friends" to respond to State's contention that defendant hunted down murder

victim by himself).  Respondent contends that the Texas Court of Criminal Appeals, on direct appeal,

considered the issue on the merits and found that a "defense theory was that [Petitioner] did not act alone and the fact that he was in a gang supported that theory" which means that the claim fails under the first *Strickland* prong.

The Texas Court of Criminal Appeals is correct that defense counsel consistently stated that their client could not have committed these crimes alone. Moreover, unlike the El Paso attorney, defense counsel in this case did not make mention of the gangs. The Court agrees with Respondent that the decision of the Texas Court of Criminal Appeals is objectively reasonable with regard to this claim. Petitioner's last exhausted claim of ineffective assistance of counsel must also be rejected.

### C. Whether Petitioner's Unwarned Confession to a Jail Guard was Obtained in Violation of His Fifth Amendment Right Against Self Incrimination

Petitioner next avers that the introduction of his alleged confession to jail guard Charles Kennimer at the Ector County Detention Center ("police department") was taken in violation of his Fifth Amendment right against self-incrimination. Petitioner avers, as an initial matter, that the Texas Court of Criminal Appeals erred in two ways in its consideration of the instant claim. Petitioner says more specifically that the Texas Court of Criminal Appeals wrongly applied the seminal case of *Rhode Island v. Innis*, 446 U.S. 291 (1980) to the facts in this case by focusing on the actions of the guard rather than Petitioner's. In addition, the Texas Court of Criminal Appeals allegedly erred in making a factual finding compared to the evidence before it. The guard testified that he told Petitioner, "I don't know what you *said* or did, but these officers are *very upset*" and Petitioner claims the Texas Court mischaracterized this statement as a "comment referring to what petitioner may have *done*

during the interview to *aggravate* the officers" rather than what he may have said necessitating *de novo* review.

Respondent challenges Petitioner's characterization of the Texas Court of Criminal Appeals's decision and the opinion, in essence, speaks for itself in that it correctly cites the appropriate portions of *Innis* and speaks correctly on what the guard remembers saying to Petitioner.   Moreover, Respondent avers that the Texas Court considered the claim in the correct posture as it relates to the trial court's decision following a suppression hearing about the confession.  Lastly, Respondent says that Petitioner is no stranger to the criminal justice system so he is fully aware of the *Miranda* protections.

In the instant case, the question surrounds the following exchange between the guard and Petitioner:

| | |
|---|---|
| Guard: | *I don't know what you said or did,* but these officers are very upset. |
| Petitioner: | These individuals are trying to pin this rap on me.  They don't have anything to pin on me.  *I did [it], but they don't have no evidence or anything like that.* |

The exchange took place after Robertson and Sanders were finished questioning Petitioner at the police station.  At that point, the guard was summoned to get Petitioner from their custody.  When he arrived where Robertson and Sanders were with Petitioner, the guard noticed the officers and Petitioner emerging from a room.  The guard testified that he knew that Petitioner had been brought there "for some interrogation."  The guard noticed that Robertson was "somewhat perturbed" with Petitioner and that Petitioner was silent, but he appeared to be very upset and hostile.  The guard testified that each time he talked to Petitioner it was to calm him down.  At the evidentiary hearing,

there was testimony that this particular exchange occurred in violation of a jail policy prohibiting communication with agitated inmates whose hostilities are more likely to worsen when engaged in conversation, thus challenging the guard's testimony that he was communicating to dissipate any hostilities.

An officer can interrogate a suspect by making a statement to him that was not framed as or intended to be a question. *Innis*, 466 U.S. at 301. A court must *primarily focus* on the suspect's perceptions to determine whether the officer should have known that the suspect was reasonably likely to make an incriminating statement. *Id.* (emphasis added). The officer's subjective intent to evoke an incriminating response can show that he should have expected one, but his lack of such intent is irrelevant. *Id.* at 302 n.7.

The Texas Court of Criminal Appeals found there was no interrogation under *Innis*, in agreement with the trial court, for the following reason:

> In the instant case, Kenimer was not part of the investigation and was merely escorting [Gonzales] back to his cell. [Gonzales] appeared upset and Kenimer made an off-hand comment in an attempt to calm him down. We agree with the trial court that a statement by Kenimer referring to what [Gonzales] may have done during the interview to aggravate the officers was not designed to or reasonably likely to elicit an incriminating response. The trial court did not abuse its discretion in refusing to suppress Kenimer's testimony.

Moreover, it properly cited the holdings in *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Innis*.

In reviewing the instant claim, the Court will not consider the claim *de novo* as Petitioner wishes. Petitioner has not provided authority for the proposition that *de novo* review of this claim is warranted under 28 U.S.C. § 2254 and the Court is not altering the course of habeas law by interpreting § 2254 differently today. The Court must examine then the decision of the Texas Court

of Criminal Appeals. In so doing, to reiterate, this Court may only grant habeas relief if the state court decision "involved an unreasonable application of" clearly established federal law as announced by the Supreme Court. *Carter v. Johnson*, 110 F.3d at 1103. "Unreasonable application" specifically means this Court "may grant relief if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 365. Most importantly, the Supreme Court clarified that "unreasonable" is broader than "incorrect" or "erroneous" which requires that this Court must consider whether the "relevant state-court decision applied clearly established federal law erroneously or incorrectly," and if so, whether the application is unreasonable. *Id.*

Petitioner strongly argues that the Texas Court erred in applying *Innis* because it wrongly interpreted the holding which carved out an exception to *Miranda* based on the suspect's perception and not the officer's subjective intent. In support, Petitioner provides a laundry list of perceptions that he could have had at the time of the exchange that indicate that the guard clearly should have known that his statement was likely to elicit an incriminating response. To summarize, Petitioner claims that his environment at the time of the exchange, the fact that the guard was summoned and that Robertson and Sanders appeared disappointed that they did not get his confession could collectively have given him the impression that the interrogation continued especially where the guards often act as the "eyes and ears of the police."

The list of potential perceptions is not enough to support the instant contention because the Texas Court of Criminal Appeals's decision did not unreasonably apply *Innis* for the following reasons. Even though the turn of events is unusual and the guard seems to give different versions of when the statement was made every time he has to relay how he obtained Petitioner's confession, the

substance of how the confession was made has not changed and this is what is relevant under *Innis*. That is, Petitioner was being questioned, the questioning ended abruptly, the guard was summoned to get Petitioner from the interrogation room, the guard talks to Petitioner about how all the parties exiting the interrogation room seemed upset and Petitioner confesses.  Moreover, the Court is not convinced that Petitioner's lengthy experience with law enforcement is irrelevant to this claim. Petitioner has had trouble with law enforcement since 5th grade and in the interim, has been arrested several times since then making him less vulnerable than most to confessing.  Furthermore, the Court in quoting directly from Petitioner's interpretation of *Innis* in his brief, indicates that *Innis* does not suggest that the perception of the individual alone should be considered in determining if a statement is made in violation of *Miranda*.   The suspect's perception is to be the primary focus of the consideration. *Id.* at 301.

Lastly, Petitioner says that the guard testified that he asked Petitioner what he "said and did" which is more likely to elicit an incriminating statement that if he had merely asked what Petitioner had "done" to agitate the interrogating officers and the Texas Court's mischaracterization that he only said "done" makes the application of *Innis* unreasonable.  While the Court appreciates the attention to such detail, it cannot agree with Petitioner's argument. From Petitioner's perspective, being asked by the guard what he "said" in the interrogation room to upset the interrogating officers could elicit all kinds of responses from him.  For example, Petitioner could have remained silent or said, "I didn't do it," "nothing," "I want to return to my cell," "I want a lawyer," etc.  Each of these responses, and others, could have upset dedicated officers hoping to solve the murder of an elderly couple.  In the end, Petitioner  was never interrogated and the guard did make an off-the-cuff remark without any knowledge that the suspect was reasonably likely to make an incriminating statement.  Therefore, the

Court finds that the Texas Court of Criminal Appeals's decision is objectively reasonable because it is clear that from where Petitioner stood, there was no interrogation.

> **D.**     ***Whether Petitioner was Denied Due Process Because the Prosecutor Knowingly Failed to Correct a Jail Guard's False Testimony that Petitioner Spontaneously Confessed to Him and that of Robertson who Testified that the Tattoos Meant Petitioner had Murdered Two People***

Petitioner next raises two claims concerning the violation of his due process rights because the prosecutor allegedly used the guard and Robertson's false testimony concerning the confession made at the police department and the meaning of the teardrop tattoos, respectively. The Court will consider these together because the same legal principles apply, but will consider each claim in turn.

First, Petitioner claims that the prosecutor knew that the guard's testimony that Petitioner confessed to him was false yet he failed to correct it before the jury in violation of the Due Process Clause. Respondent counters that there is no evidence that the statement made to the guard was not a confession and points to the self-serving affidavit Petitioner filed with the Texas Court of Criminal Appeals denying involvement. It is settled that the prosecution may not knowingly use perjured testimony or allow perjured testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 154 (1972). To prove a due process violation in such a case, a petitioner must demonstrate: (1) that the testimony in question was actually false, (2) that the prosecutor was aware of the perjury, and (3) that the testimony was material. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). The Fifth Circuit has further held that the "Fourteenth Amendment is implicated by the introduction of fraudulent or perjured testimony only if the prosecution has actual knowledge of the perjury." *Carter v. Johnson*, 131 F.3d 452, 458 (5th Cir.

1997).

In the instant case, there has been dispute at every stage of the state and federal habeas proceedings as to what the exact translation of Petitioner's statement to the guard was at the jail. There is no conclusive evidence that the statement was not what the guard testified it was at trial. Moreover, the Texas Court of Criminal Appeals considered the instant claim and the affidavit provided by Petitioner denying that the statement introduced at trial was never made. At the evidentiary hearing, Petitioner called into question the actual translation of the statement, but as Respondent points out "Gonzales is now apparently willing to admit that he actually made the comments at issue to the guard" that is less incriminating than the statement introduced at trial. The Texas Court held that the claim was unsupported by the record as a matter of law. The decision of the Texas Court is not contrary to clearly established federal law because Petitioner has not shown that the guard perjured himself as to what statement was made or that his testimony was false as required under the applicable law.[18] The first claim that Petitioner's due process rights were violated by false testimony is without merit.

The second claim under this same standard involves the testimony of Robertson as to the meaning of the two teardrop tattoos worn on Petitioner's face. Petitioner claims that Robertson falsely testified that the teardrop tattoos, among gang members, can only mean that the person has

---

[18]"When reviewing a pure question of law, a federal court may grant habeas relief only if the state court decision was 'contrary to' clearly established federal law, as determined by the Supreme Court." *Carter*, 110 F.3d at 1103 (referencing *Drinkard*, 97 F.3d at 767-768). The Supreme Court looked to the commonly understood definitions of "contrary" to explain what Congress meant by "contrary to" in Section 2254(d)(1). *See Williams*, 529 U.S. at 364. The Supreme Court concluded that "2254(d)(1)'s first clause must be interpreted to mean that a federal habeas court may grant relief if the state court (1) arrives at a conclusion opposite to that reached by this Court on a question of law or (2) decides a case differently that this Court has on a set of materially indistinguishable facts." *Id.*

killed two people based on the number of teardrops. Petitioner further asserts that this evidence, which gave the jury a false impression, was the only evidence that Petitioner could have killed both victims. Respondent contends that there is no evidence that the tattoos can only mean that Petitioner killed two gang members and challenges the Petitioner's present position as to the meaning of the tattoos now compared to what was said at the state habeas level. Respondent further avers that Petitioner's position actually shows that Robertson's testimony was not false because even assuming Petitioner's current position on the meaning of the tattoos is true, two people were murdered by the Defendant. The Court finds Respondent's points compelling since the explanation shows that Robertson's testimony was not false even under Petitioner's interpretation of the tattoos's meaning. The decision of the Texas Court is not contrary to clearly established federal law even under Petitioner's new theory on the meaning of each teardrop tattooed. Therefore, both due process claims challenging allegedly false testimony that the prosecutor failed to correct are unfounded.

## II    SENTENCING PHASE

### E.    Whether the State Violated Petitioner's Eighth and Fourteenth Amendment Rights by Using Race as a Sentencing Factor

Respondent and Petitioner agree that a new sentencing hearing must be held because Defendant's Eighth and Fourteenth Amendment rights were violated by the introduction of testimony at the punishment phase of trial inviting the use of race as a factor in determining future dangerousness. In Petitioner's Supplemental federal Application, he contends that Dr. Walter

Quijano, a psychologist who was called by the State as an expert witness at the punishment phase of trial, identified "race" as one of twenty-four factors which can be considered in making predictions of future dangerousness in both his testimony before the jury and in his report which was admitted into evidence at trial in violation of the Eight Amendment's Arbitrary-And-Capricious Doctrine and the Fourteenth Amendment's Equal Protection Clause.  Moreover, Dr. Quijano's testimony that "minority groups are overrepresented in criminal justice institutions, prisons, parole, [and] probation" further violated his Eighth and Fourteenth Amendment rights.  Respondent concedes the violations and waives any procedural defaults and the exhaustion requirement with regard to this claim agreeing to *de novo* review.  Respondent further elaborates on the inexcusable nature of the testimony in saying, "[w]hile attempts were made to lessen the impact of Dr. Quijano's race-based testimony, the issue of race had already become something that the jury was invited to consider in determining Gonzales' fate."

An application under 28 U.S.C. § 2254 "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  Here, the claim was not adjudicated by the State court which means that the standard of review for an unexhausted claim on federal habeas is *de novo*. *See Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997) (where claim was not presented to state court and Director waives exhaustion requirement, Court of Appeals conducts *de novo* review).

Having established authority to consider the claim, the question becomes the extent of the consideration necessary in light of the State's confession of error which neither party addressed.

Simply put, regardless of the procedural posture of the case or legal issue, all the case law says that a stipulation by the parties cannot supplant the judiciary's obligation to consider the claim on the merits.  In *Young v. United States*, the Supreme Court stated:

> The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed.  The public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding.  That interest is entrusted to our consideration and protection as well as that of the enforcing officers.  Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of the parties.

315 U.S. 257, 258-59 (1942)(citations omitted).  The same reasoning has applied in a variety of contexts.  For example in a criminal case, *Sibron v. New York*, 392 U.S. 40, 58-9 (1968), and in a civil case, *Atkins v. United States*, 556 F.2d 1028, 1058 n.15 (1977), *cert. denied*, 434 U.S. 1009 (1978).  Moreover, the reasoning has applied after trial such as in an appeal from the denial of a motion brought pursuant to 28 U.S.C. § 2255, *Cachoian v. United States*, 452 F.2d 548, 550 (5th Cir. 1971), and in habeas cases, *Every v. Blackburn*, 781 F.2d 1138, 1140 (5th Cir. 1986).

Confessions of error, however, are to be given "great weight" when the Court performs its judicial function.  *Sibron*, 392 U.S. at 56.  In *Sibron*, the Supreme Court further found that more weight should be given to a confession of error made by a state official on behalf of the entire state executive and judicial branches than if "the elected legal officer of one political subdivision within the State" makes the confession.  *Id.*  In that same case, the Supreme Court explained that courts are obligated  to "lower courts to decide cases upon proper constitutional grounds in a manner which permits them to conform their future behavior to the demands of the Constitution."  In light of clear precedent, the Court turns to the merits and will give the Notice of Error great weight since it was

made by a state official, the former Texas Attorney General rather than the locally elected District Attorney.

In the instant case, Petitioner was sentenced to death after a jury found that he would be a future danger to society and that Petitioner's brain damage, learning disorders, emotional and physical abuse by parents, neglect, drug abuse from the age of 6 did not mitigate the death sentence. Before reaching its decision, the jury heard the testimony of Dr. Quijano who testified that Petitioner's race was considered as a basis for his opinion that Petitioner would be a future danger to society. Dr. Quijano further testified that for him to make a reasonable judgment on future dangerousness he considered three main clusters of factors and that these "simply are factors that are through the years and through national studies somehow correlate very highly with dangerousness." The first cluster, comprised of the "sophistical factors," include "past crimes that the person has committed, the age of the individual, the sex of the individual, *the race of the individual*, socioeconomics, employment and then history of substance abuse.[19]" Dr. Quijano then gave his opinion about each of the "sophistical" factors and said that "race, Hispanic, there is no data to show that that is a factor,

---

[19]The essence of Dr. Quijano's testimony was that "sophistical factors" are past behavior characteristics and that these are the best indicators of future dangerousness. He did not define the term "sophistical" to the jury, nor did counsel inquire into the meaning. In addition, the Court was unable to find testimony or other evidence defining "sophistical" in the record. A "sophistical" factor as defined by Webster's dictionary, is one "that appears to be plausible but is actually fallacious." The Court is puzzled with the expert's use of this term, as it would seem to imply that Dr. Quijano was aware that the characteristics (such as those based on race) he was describing were false indicators of future dangerousness, yet he hid behind his denomination as "expert" in order to persuade the jury that they were true. Perhaps in the area of psychology, the term "sophistical" carries a different meaning; however, the Court is unaware of any variation. Thus, adopting the plain meaning of the word, it seems that Dr. Quijano was cognizant of the inaccurate corollary between future dangerousness and race. Although the Court does not want to belabor the point, the expert's suggestion that he knew his testimony to be misleading further discredits his opinion. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2174 (1964).

although minority groups are overrepresented in criminal justice institutions, prisons, parole [and] probation." Given the nature of his testimony, the punishment imposed and the gravity of the case to the Aguirre and Gonzales family, the Court now turns to what our courts say should be done.

It is important to begin the discussion by acknowledging that a long line of Supreme Court cases have considered the claim under both Amendments and the decisions have repeatedly "admonish[ed] that the guillotine must be as color-blind as is the Constitution." *United States v. Webster*, 162 F.3d 308, 356 (5th Cir. 1998), reh'g denied (1999)(holding that the Federal Death Penalty Act is constitutional because it prohibits the consideration of race in sentencing as dictated by the Equal Protection Clause); *see, e.g., McCleskey v. Kemp*, 481 U.S. 279, 292-93 (1986), reh'g denied (1987)(stating, "[w]e have expressed a moral commitment, as embodied in our fundamental law, that this specific characteristic should not be the basis for allotting burdens and benefits").

The Eighth Amendment prohibits using race as a sentencing factor. The Eighth Amendment allows the death penalty as an appropriate response to especially egregious crimes, it also strictly regulates the procedures by which death sentences are imposed and reviewed. *See Caldwell v. Mississippi*, 472 U.S 320, 329 (1985)(asserting that the need for reliability in death sentences "requires a correspondingly greater degree of scrutiny of the capital sentencing determination"). If a state is going to impose a death sentence, then it must have sentencing procedures in place for capital crimes to secure "that the punishment will [not] be inflicted in an arbitrary and capricious manner." *Flores v. Johnson*, 210 F.3d 456, 458 (5th Cir. 2000)(Garza, J., specially concurring)(quoting *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)(plurality opinion)(acknowledging that death as a punishment is severe and irrevocable, but that the Framers in writing the Constitution found it to be acceptable)). Simply put, to avoid being arbitrary and capricious a death sentence must

be applied in a way that is "directed and limited." *Gregg*, 428 U.S. at 189.

Moreover, using race as a sentencing factor is unconstitutional under the Equal Protection Clause. The Equal Protection Clause protects from purposeful state discrimination on the basis of races. *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Court proceedings, especially criminal trials, implicate state action, therefore bringing them under equal protection scrutiny. *Georgia v. McCollum*, 505 U.S. 42, 49-55 (1992). More specifically, in our case, the Equal Protection Clause prohibits the state from using race in its decision-making, unless it can meet the "most exacting scrutiny ... justified by a compelling government interest." *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984). In the realm of capital sentencing, this standard never can be met, because race is a "totally irrelevant factor." *Zant v. Stephens*, 462 U.S. 862, 885 (1983)(holding that due process requires that death sentence be vacated where Equal Protection Clause violated).

Beginning with *Gregg,* the courts initiated guidance on what would make the sentencing discretion fair for capital crimes. One of the constitutional mandates that surfaced is  that capital sentencing must be individualized. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Penry v. Lynaugh*, 492 U.S. 302, 317 (1989); *Zant*, 462 U.S. at 879. Under the Eighth Amendment an individualized determination means that the defendant is sentenced for a capital crime based on "the character and record of the individual offender and the circumstances of the particular offense." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *see Enmund v. Florida*, 458 U.S. 782, 801 (1982)(holding that capital punishment "must be tailored to [the defendant's] personal responsibility and moral guilt"); *see also, Flores*, 210 F.2d at 460 (stating that what is required is that "sentencers determine whether imposing death on a particular defendant is a rational and morally appropriate response to the accused's crime and character"). The Court finds that when the State in this case introduced race

as part of its basis for asking that Petitioner be found to be a future danger to society thereby justifying a death sentence, it was grouping him with others negating individual consideration as dictated by the Supreme Court. To hold otherwise would reinstate this country's unconstitutional practice before *Furman v. Georgia*, 408 U.S. 238, 311 (1972) (plurality opinion) (holding that the death penalty was being imposed in an arbitrary and capricious manner because race was being considered)(Stewart, J., concurring) and *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976)(plurality opinion)(holding that the mandatory death penalty statutes in North Carolina and Louisiana unconstitutional because they treated all convicted persons "not as uniquely individual human beings, but as members of a faceless, undifferentiated mass." Therefore, Petitioner's sentence was imposed after the State invited race to be considered as a sentencing factor negating the individual consideration constitutionally mandated.

Part of individualized consideration are that mitigating factors in a person's life will be considered. In *McClesky*, the Supreme Court held that "[a]ny exclusion of the compassionate or mitigating factors stemming from the diverse frailties of humankind that are relevant to the sentencer's decision would fail to treat all persons as uniquely individual human beings." 481 U.S. at 304 (citations and internal quotation marks omitted). The record reflects that Petitioner put on mitigating testimony through two experts, a neuropsychologist and a clinical psychologist. Dr. Quijano's testimony made irrational consideration of the special issues more likely, as were prevalent before *Furman,* in two respects. First, having said that Petitioner, by virtue of being Hispanic, is a future danger to society puts the mitigation evidence at risk. A juror considering race "might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance." *Turner v. Murray*, 476 U.S. 28, 35 (1986)(juror who believes Hispanics to be

violence prone may be influenced by such belief in determining whether crime involved aggravating factors specified by Texas capital statute). Second, as the *Turner* Court held, due to the range of discretion placed in the hands of the capital jury at punishment, "there is a unique opportunity for racial prejudice to operate but remain undetected." 476 U.S. at 35. Therefore, the Court further finds that the mitigation evidence was compromised because the mitigation evidence of someone equally situated who is not Black or Hispanic would not be discounted based on the presumed future dangerousness due to pigmentation.

Dr. Quijano's testimony on race rendered the sentencing hearing unconstitutional because his opinion, based in part on Petitioner's race, is evidence that jurors always give great weight to in considering future dangerousness. "[W]hen a medical doctor testifies that 'future dangerousness' is a scientific inquiry on which they have particular expertise, and testifies that a particular defendant would be a 'continuing threat to society,' juries are almost always persuaded." *Johnson*, 210 F.3d at 466 (Garza, J., specially concurring)(citations omitted). Moreover, "[j]urors faced with the responsibility of determining whether an individual who committed at least one murder will kill or otherwise commit violence again, and threatened with the immeasurable potential consequences, even if its reliability is questioned by another 'expert.'" *Id.* (citations omitted). Simply put, the issue of race as it related to the special issue of future dangerousness presented by the State's qualified expert made finding a death sentence the only sentence for the jury to impose because being Hispanic is an unalterable characteristic belonging to Petitioner.

Lastly, the fact that the Court cannot make a specific finding that any of the jurors used the race factor to answer the mitigation and future dangerousness special issues posed to them at Petitioner's punishment phase does not trump the matter. Justice Douglas and other members of the

Supreme Court concluded that "[w]e cannot say from facts disclosed in these records that these defendants were sentenced to death because they were black." *Furman*, 408 U.S. at 253 (Douglas, J., concurring).   Very recently, the Supreme Court recently said the same thing.   "It cannot be doubted that behind the Court's condemnation of unguided discretion [in *Furman v. Georgia*] lay the specter of racial prejudice - the paradigmatic capricious and irrational sentencing factor." *Graham v. Collins*, 506 U.S. 461 (1993)(Thomas, J., concurring).

In summary of this claim, the Court recognizes that the murders committed by Petitioner Michael Dean Gonzales were brutal, possibly necessitating the most serious of punishment under our laws, but the ultimate punishment must be imposed without reference to race.

### Conclusion

In sum, the Court will grant Respondent's Partial Motion for Summary Judgment because there is no question of material fact as to any of Petitioner's claims concerning the guilt/innocence phase of his trial and each of those claims lack merit under the applicable law requiring their dismissal. The Court will acknowledge Respondent's Notice of Error as to the punishment phase and grant Petitioner another sentencing hearing because the State invited the jury to use race in ruling on the special issues they had to answer in imposing the death sentence in this case where the law unquestionably holds that such an invitation violates the Eighth and Fourteenth Amendments of the United States Constitution.

**IT IS HEREBY ORDERED** that Respondent's Partial Motion for Summary Judgment is **GRANTED.** The jury verdict and judgment as to conviction therefore remain in full force and effect. To this extent, Petitioner's Application for Writ of Habeas Corpus is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Petitioner's Writ of Habeas Corpus as to all sentencing issues is **GRANTED** and that **PETITIONER MICHAEL DEAN GONZALES' SENTENCE** is **VACATED**.

**IT IS FURTHER ORDERED** that **PETITIONER MICHAEL DEAN GONZALES** is **GRANTED** a **NEW SENTENCING HEARING** and this cause is **REMANDED** to the 358th District Court of Odessa, Ector County, Texas so that a jury may answer the special issues without concern for his race. The Court asks the trial court that the same excellent attorneys who represented Petitioner herein be appointed at the new sentencing hearing for several reasons: 1) they are very familiar with the case and Petitioner which will save the Texas taxpayers money; 2) such an appointment will assure that the most competent of counsel is appointed in a case where life is at stake; and 3) such an appointment will allow for a faster resolution of the case that is so very important to the citizens of Odessa, Ector County, Texas and the families involved.

Signed on this 19th day of **December, 2002.**

Royal Furgeson

**ROYAL FURGESON**
United States District Judge
Western District of Texas