United States Court of Appeals
Fifth Circuit

# UNITED STATES COURT OF APPEALS

**F I L E D**

July 31, 2006

## FOR THE FIFTH CIRCUIT

Charles R. Fulbruge III
Clerk

---

No. 03-50021

---

D.C. Docket No. MO-99-CV-72

**FILED**

SEP 1 2 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

MICHAEL DEAN GONZALES

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeals from the United States District Court for the
Western District of Texas, Midland.

Before JONES, Chief Judge, JOLLY and GARZA, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was
argued by counsel.

It is ordered and adjudged that the judgment of the District
Court is affirmed.

ISSUED AS MANDATE: AUG 3 0 2006

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _Gina Randazzo Martin_
Deputy     AUG 3 0 2006
New Orleans, Louisiana

United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 31, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 03-50021

———————————

MICHAEL DEAN GONZALES,

Petitioner - Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION,

Respondent - Appellee.

———————————————————————————————

Appeals from the United States District Court
for the Western District of Texas, Midland
USDC No. MO-99-CV-72

———————————————————————————————

Before JONES, Chief Judge, JOLLY, and GARZA, Circuit Judges.

PER CURIAM:

Michael Dean Gonzales was found guilty of capital murder
and sentenced to death.  During federal habeas proceedings, the
State conceded that he is entitled to a new sentencing hearing.
The issues here include an alleged <u>Brady</u> claim and two
ineffectiveness allegations.  Finding no error that meets the
demanding AEDPA review standards, we AFFIRM.

### I. BACKGROUND

A Texas jury convicted Gonzales of killing Manuel and
Merced Aguirre.  Gonzales stabbed the Aguirres to death in their
home in Odessa, Texas on the night of April 21, 1994.  Mr. Aguirre

was stabbed eleven times and Mrs. Aguirre had stab wounds too numerous to count, including many defensive wounds.   A blood spatter expert testified that Mr. Aguirre was overcome quickly, but Mrs. Aguirre fought even after falling to the floor in the attack. The medical examiner testified that she had been "basically butchered."[1]

The police investigation of the crimes quickly focused on Gonzales, who, along with his mother, wife, and child, lived in the house next door to the Aguirres.   Prior to the night of the murders, the Aguirres had complained to the police about being disturbed by Gonzales's late night activities.   The Aguirres' son testified that their fear of Gonzales was one of the reasons why they had put bars on their windows.

Gonzales was taken into custody for questioning approximately sixteen hours after the murders, and he consented to a luminol test of his arms, hands, and shoes.   Except for the site on Gonzales's arm where the police had drawn blood that day, the luminol test did not indicate the presence of blood on the portions of Gonzales's body that were tested.   Gonzales was released from custody after being questioned.

The police found a "blood transfer" stain on a camper parked in the alley between the Aguirre and Gonzales houses.

---

[1]      These facts are largely taken from the opinion of the Texas Court of Criminal Appeals affirming Gonzales's conviction on direct appeal.   Gonzales v. State, No. 72,317 (unpublished).

2

Police also noticed that the alley had recently been swept clean. An anonymous Crime Stoppers informant reported that Gonzales had swept the dirt in that alley the morning after the murders.

Police also found a red pepper on the floor underneath Mrs. Aguirre's body.  The same type of pepper was found on Gonzales's back doorstep, and a bowl of the same peppers was found in his refrigerator.  Detective Snow Robertson testified at trial that he had attempted, unsuccessfully, to locate such peppers in local stores.  There was evidence that these peppers were not native to Texas and were unique to a certain area of Mexico.

Linda Olivarez testified that on the night of the murders, Gonzales and his wife and child came to her home around 10:15 p.m.  Gonzales had brought with him a plastic bag that he left outside by Olivarez's front gate.  Gonzales left with a man in a truck, and returned shortly thereafter.  He asked his wife to pick up the plastic bag when they left.  The State's theory was that the plastic bag contained the bloody clothing Gonzales had worn when he stabbed the Aguirres.

On the day after the murders, a neighbor found property belonging to the victims in front of the dumpster located on the route from Gonzales's house to the Olivarez home.  Police later found more of the Aguirres' property in or around the dumpster.

Although there was no sign of forced entry, the Aguirres' son had identified a microwave, a VCR, a camera, a stereo, and a .22 pistol as missing from their house.  Less than a week after the

3

murders, Gonzales asked Olivarez and her husband, Julian, if they wanted to buy a microwave oven.  Julian told Gonzales he would have to see it first.  Julian, Linda, and Gonzales went to Gonzales's house, where Gonzales showed them a VCR, a camera, and a stereo for sale.  The Olivarezes purchased the microwave, VCR, and stereo. Gonzales also showed Julian a .22 caliber pistol, but told him it was not for sale.  Gonzales said, "They are on to me."  When Julian asked what he meant, Gonzales replied, "No, I can't tell you."

After the Olivarezes took the items to their home, Gonzales retrieved the stereo because they had not paid for it yet and he had already sold it to someone else.  During interrogation, Daniel Lugo, a member of Gonzales's gang, told the police that he had the Aguirres' stolen stereo, which he had gotten from Gonzales. Gonzales's fingerprint was found on the back of the stereo.  The pistol was eventually recovered from Delia Sanchez, who testified that she purchased it from Gonzales.  All of these items were later identified as those stolen from the Aguirres' home.  Some empty shell casings found in a box at Gonzales's house were determined to have been fired from the Aguirres' gun.

Police also found a white Dexter & Russell kitchen knife in Gonzales's home.  The medical examiner testified at trial that this type of knife could have caused both of the victims' wounds. On cross examination, the medical examiner stated that he could not rule out the possibility that Mrs. Aguirre was stabbed with more than one knife.

4

Gonzales was arrested fifteen days after the murders and charged with capital murder for the murder of more than one person during the same criminal transaction.  Upon arrest, Gonzales had two teardrop tattoos on his face; at trial, an officer testified that these tattoos were a gang symbol signifying the number of people a person has killed.  Gonzales was in a gang called "Homies Don't Play."  No one else was charged in the murders.[2]

On the day Gonzales was arrested, Charles Kenimer, a guard at the local jail and Gonzales's relative, saw Gonzales leave a police station interrogation room with Detective Robertson and a Texas Ranger.  Kenimer testified that Gonzales seemed upset and that he tried to calm Gonzales by stating, "Boy, you really got these officers upset.  I don't know what you said."  Kenimer testified that Gonzales responded, in Spanish, "They're trying to pin this rap on me, this murder rap on me.  They can't do it.  They don't have any evidence.  Although I did it, you know, but they don't have anything to go on."[3]

---

[2]      Detective Robertson suspected that two other gang members, Daniel Lugo and Jesse Perkins, were involved in the murders.  Julian Olivarez believed that both of them probably had something to do with the murders.  Lugo had told a friend that there were dead bodies in the Aguirres' house at least an hour before the crime was reported by the Aguirres' son.

[3]      In part of his habeas petition for which this court did not grant a COA, Gonzales argued that his counsel was ineffective for failing to impeach Kenimer with the somewhat different statement Kenimer made soon after this confession.  Then, Kenimer reported that:
> I was escorting [Gonzales] back to his cell, in D Block.  He then blurted out "They can't pin nothing on me".  I told him I don't know, I'm not familiar with what your case is.  Michael Gonzales is my third cousin, on my mother's side, and he knows I'm his cousin.  Michael then said "I did it, but they can't pin nothing on me." I then told him I don't know what you're talking about.  He replied was (sic) "On the murder of the old man and the old lady."

During the guilt-innocence phase, the defense strategy was to highlight evidence of other parties' involvement in the offense, and to emphasize the State's burden of proof. The prosecution did not request a jury instruction on the law of parties. Thus, the jury was required to find that Gonzales intentionally caused the death of both victims by stabbing them. During closing argument, defense counsel argued that the evidence strongly suggested that other suspects were involved, and that there was no direct evidence that Gonzales murdered both victims. Defense counsel repeatedly reminded the jury that Gonzales could not be held responsible for an accomplice's criminal conduct. Nevertheless, during his final closing argument, the prosecutor argued, without objection, that Gonzales was guilty of capital murder even if he killed only one of the victims and aided and abetted someone else in the killing of the other victim. During deliberations, the jury asked the following question: "we need clarification on capital murder versus murder verdict. If Mr. Gonzales murdered one individual only, then does his association make him guilty of both." The trial judge responded by referring the jury to the charge.

The jury found Gonzales guilty of capital murder. Following the punishment phase, the jury answered the special issue on future dangerousness affirmatively and answered the special issue on mitigation negatively; thus, Gonzales was sentenced to death. The Texas Court of Criminal Appeals affirmed the conviction

on direct appeal in June 1998.  <u>Gonzales v. State</u>, No. 72,317 (unpublished).  Gonzales's state habeas application was denied by the trial court and the Texas Court of Criminal Appeals.  <u>Ex Parte Michael Dean Gonzales</u>, No. 72,317, Writ No. D-23,370.

Gonzales filed his federal habeas petition in January 2000, raising six claims for relief:  (1) the prosecutor denied him due process by concealing the exculpatory negative result of a luminol test for blood; (2) he was denied effective assistance of counsel on direct appeal because his attorney did not appeal the denial of his motion for new trial; (3) he was denied effective assistance of counsel at the guilt and punishment phases of his trial (nine sub-claims); (4) his unwarned confession to Kenimer violated his Fifth Amendment right against self-incrimination; (5) he was denied due process because the prosecutor knowingly failed to correct Kenimer's false testimony that he spontaneously confessed to him; and (6) the prosecutor denied him due process by knowingly allowing a police officer to give the jury the false impression that his teardrop tattoos meant that he had killed two people.

Gonzales filed a supplemental petition in August, 2000, asserting that the State's psychological expert witness testified, unconstitutionally, that race is an indicator of future dangerousness.  The State conceded that this claim is valid and entitled Gonzales to a new sentencing hearing.  The district court so ordered, and neither party has appealed its ruling on this

7

point.

In March 2001, the district court held a two-day evidentiary hearing on the <u>Brady</u> and ineffective assistance claims. The district court denied relief in a carefully written opinion and denied Gonzales's request for a certificate of appealability ("COA").

## II. DISCUSSION

This court granted a COA for Gonzales's claims that:

(1) the prosecutor withheld exculpatory evidence in violation of the Due Process Clause by concealing the negative result of a luminol test;

(2) trial counsel rendered ineffective assistance by failing to refute a police officer's testimony that the two teardrops tattooed on Gonzales's face represented the number of people he had killed; and

(3) trial counsel rendered ineffective assistance by failing timely to object to a police officer's testimony that Gonzales's mother hid knives from Gonzales because she feared that he was going to kill her and his family.

This court denied a COA for Gonzales's procedurally barred claims and his cumulative ineffective assistance of counsel claim. <u>See</u> <u>Gonzales v. Dretke</u>, No. 03-50021 (5th Cir. Feb. 7, 2005).

## A. Standards of Review

8

Gonzales is not entitled to federal habeas relief on these claims unless the state court's adjudication of the claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . . if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). A decision "involve[s] an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States . . . if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. at 1523. The inquiry into reasonableness is objective rather than subjective, and the court is not authorized to grant relief simply because the court concludes in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly. Instead, habeas relief may be granted only if the state court's decision is

both incorrect and objectively unreasonable.  Id. at 409-11, 120 S. Ct. at 1521-22.  A state court's findings of fact are presumed to be correct unless the petitioner rebuts the presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Federal law concerning the disclosure of exculpatory evidence is clearly established: The prosecution must disclose to the defense evidence that is favorable and material to the defendant's guilt or punishment.  United States v. Bagley, 473 U.S. 667, 674-75, 105 S. Ct. 3375, 3379 (1985); Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196 (1963).  To establish a Brady violation, a defendant must show:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999).

The law governing ineffective assistance claims also is well-established:  To succeed on these claims, Gonzales must show that his counsel's performance was deficient and that he was actually prejudiced by the deficient performance.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Whether counsel's performance was deficient is determined by examining whether the challenged representation fell below an objective standard of reasonableness.  Kitchens v. Johnson, 190

10

F.3d 698, 701 (5th Cir. 1999).  The court's "scrutiny of counsel's performance must be highly deferential."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.  "[C]ounsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment."  Id. at 690, 104 S. Ct. at 2066.

The test for prejudice under Brady and Strickland is the same:  Gonzales must establish that there is a reasonable probability that, if the evidence had been disclosed, and/or if counsel had not performed deficiently, the result of the proceeding would have been different.  A reasonable probability of a different result is shown when the suppressed evidence or counsel's mistakes undermine confidence in the outcome of the trial.  Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

The issue before this court is not whether Gonzales made the required showing under Brady and Strickland.  Instead, under AEDPA, the issue is whether the state court's decision—that Gonzales did not make the required showing—was contrary to, or an unreasonable application of, that clearly established federal law.  See Busby v. Dretke, 359 F.3d 708, 717 (5th Cir. 2004).

**B. Merits**

### 1. Disclosure of the Luminol Test

Gonzales argues first that the state court unreasonably

applied clearly-established federal law when it decided that the prosecutor did not unconstitutionally withhold exculpatory evidence by concealing from the defense that the luminol test was negative.

When Gonzales was taken into custody for questioning sixteen to eighteen hours after the murders, police officers Lambert and Thomas conducted a luminol test on Gonzales's hands, arms, and shoes. Luminol becomes fluorescent when it comes into contact with any traces of blood. The only area that appeared fluorescent was at the crook of Gonzales's arm, where blood had been drawn shortly before the test. Lambert's report characterized the test result as "inconclusive."

Defense counsel were aware of the report describing the luminol test as "inconclusive." When, after trial, they learned that the result was actually negative, they sought a new trial, arguing that the prosecution's deception violated Gonzales's due process rights.

At the hearing on the motion for new trial, the prosecutor conceded that the perpetrator probably would have become bloodstained if he had inflicted all of the stab wounds that the victims sustained. Detective Thomas testified that, on the day of the test, he orally informed Detective Robertson that the result was negative. Robertson did not recall receiving that information from Thomas and did not mention it in his report.

Lambert and Thomas testified that they did not ask

12

Gonzales whether he had washed his hands and arms in the sixteen hours before the test because they did not think it could have affected the result.  Gonzales appeared well-groomed and clean at the time of the test.  Thomas believed that it would have been "very difficult" for Gonzales to have completely removed all of the blood from his skin before the luminol test.  Lambert testified that luminol can reveal invisible traces of blood on a surface that appears to be clean.  Both officers agreed that "negative" would have been more accurate than "inconclusive" to describe the test result.

Detective Robertson believed, in contrast, that Gonzales could have washed all of the blood from his skin in the interval between the murders and the luminol test.  Wilson Young, a serologist with the Texas Department of Public Safety, testified that Gonzales could have successfully removed all invisible traces of blood from his skin during the time between the murders and the luminol test.  He admitted that he did not know whether it was more difficult to remove invisible traces of blood from human skin than from other surfaces, because he had no training or experience using luminol on skin.

The trial court denied the motion for new trial. Gonzales raised the issue in his state habeas application.  The state court recommended that relief be denied, stating that there was no necessity for a fact finding hearing as there was ample

evidence in the record for the court to rule on the relief sought, and that this claim was fully litigated in the hearing on Gonzales's motion for a new trial.  The Texas Court of Criminal Appeals accepted that recommendation.

The federal district court held that the prosecutor had an obligation to reveal the negative test result even though defense counsel had access to the prosecutor's entire file, including Lambert's report, and even though Gonzales was present when the test was conducted and the results were immediately obvious to him.  The district court concluded, however, that the negative test result was not material because there is no reasonable probability that it would have changed the jury's finding that Gonzales caused the death of both victims.[4]  The court observed that Gonzales could have worn clothes that concealed his skin and could have disposed of any bloody clothing prior to entering his home.  Thus, evidence that there was no blood on his skin sixteen or eighteen hours after the murders did not negate evidence that implicated him.  The court was not persuaded by Gonzales's argument that the bloody hand-print found on the kitchen wall near Mrs. Aguirre's body proved that the perpetrator did not

---

[4]     Gonzales argues that the district court applied a too-stringent materiality standard in holding that the evidence "would not have changed" the jury's verdict.  The issue at this stage, however, is not whether the federal district court applied the wrong standard, but whether the state court's decision was an unreasonable application of federal law.  Based on our conclusion that the test result was not concealed from Gonzales's defense, we need not reach the question of materiality under Brady.

14

wear gloves when committing the crime.   The court noted that the hand-print was not used as evidence against Gonzales although it could have belonged to the perpetrator; the hand-print could also have been that of the victim or of a second assailant.   The court stated further that, after having reviewed a videotape of the crime scene, introduced into evidence at the guilt-innocence phase of trial, the court was convinced that the blood was surprisingly isolated and not the bloody scene Gonzales described in support of his Brady claim.

The state court's decision to deny relief is not unreasonable, even when considered in the light of new evidence presented at the federal evidentiary hearing,[5] as the test result was not concealed.   Gonzales was present during the test and saw the result.   Even assuming that he did not understand the implications of the test, his attorneys had access to an open file that contained Lambert's report describing the test result as "inconclusive."   Although defense counsel chose not to investigate further because of Lambert's conclusion, they acknowledged that "inconclusive" could cut either way.   Had counsel asked Gonzales

_____

[5]     At the hearing, Gonzales presented the testimony of a forensics expert who performed an experiment to demonstrate the unlikelihood of a negative luminol test on a person who had just committed a bloody crime.   This experiment did not duplicate the conditions of the crime and the test conducted on Gonzales. The expert coated his left hand with blood, let it sit for an hour while playing a computer game, took a shower to remove the blood, and then a few hours later applied luminol.   In contrast, Gonzales had at least sixteen hours to remove any blood from his skin.   The expert's test did not prove that blood could not be removed under the circumstances of this case, and the expert testified that he had never seen any reference to luminol on human skin.

what had happened during the test, his response would have alerted counsel to the possibility that the evidence could be exculpatory. In short, defense counsel knew of information that would have enabled them to discover the actual test result if they had questioned Gonzales or the police officers who administered the test.

### 2. Ineffective Assistance: Teardrop Tattoos

Gonzales's principal ineffective assistance claim is that the state court unreasonably applied federal law when it decided that trial counsel were not ineffective although they failed to refute Detective Robertson's testimony about Gonzales's teardrop tattoos.

When Gonzales was arrested two weeks after the offense, he had two teardrops tattooed on his face. At trial, Detective Robertson testified that teardrops tattooed on a gang member's face represent the number of people that the individual has killed. Defense counsel objected on the ground that Robertson was unqualified to give an expert opinion on the subject. After Robertson described his gang-related training, the trial court overruled the objection and admitted the testimony. Defense counsel did not cross-examine Robertson about the tattoos, and did not present expert testimony about the possible meaning of the tattoos at the guilt phase of trial. In closing argument, the prosecutor characterized the tattoos as an admission of the murders

of two people:

> Some of the days that you were here, you saw me wearing
> a Shriner pin.  I am a Shriner.  I am proud of that, and
> I wear that symbol proudly.  Well, gangsters in their own
> way have their symbols and they wear them proudly.  Two
> teardrops.   What does that mean?   That means he has
> killed two people.  And the symbol is there for those of
> his kind to see and appreciate.  He doesn't try to hide
> it.  It is as much as leaping out and saying to you, "I
> did it, but they will never prove it."

On direct appeal, Gonzales argued that Robertson's testimony about the two teardrop tattoos was offered to prove that he had committed two extraneous murders, and that his counsel rendered ineffective assistance by failing to object to the testimony on that ground.  The Texas Court of Criminal Appeals disagreed, stating that, from the context of the testimony, Robertson seemed to be presenting evidence that Gonzales committed the murders of Mr. and Mrs. Aguirre.  The court concluded that, because the testimony was not extraneous offense evidence, trial counsel did not render ineffective assistance by failing to object to it as such.[6]

In his state habeas application, Gonzales raised three claims with respect to Robertson's testimony about the teardrop tattoos:  (1) the prosecution violated Brady by failing to reveal

---

[6]    In a motion for rehearing, Gonzales reiterated that Robertson's testimony about the teardrop tattoos was related to an extraneous offense.  He asserted that the Court of Criminal Appeals ignored that Robertson referred to "people" in relation to the tattoos but called the victims by their names elsewhere in his testimony.  Gonzales's motion for rehearing concluded:  "A review of all the testimony of Robertson clearly shows that the evidence of tattoos did not relate to the instant offense."  The Court of Criminal Appeals denied rehearing.

17

that teardrop tattoos on the face of a gang member have many possible meanings, as opposed to the false testimony at trial that they mean that the person bearing such marks murdered someone; (2) the prosecution allowed Detective Robertson to present false testimony concerning the teardrop tattoos; and (3) trial counsel rendered ineffective assistance by failing to investigate (including by consulting with a gang expert or Gonzales) the meaning of the teardrop tattoos and failing to use the fact that such tattoos can have many different meanings, and by failing to object to Robertson's testimony as evidence of an extraneous offense.

In support of his state habeas application, Gonzales presented three affidavits, all stating that teardrop tattoos have multiple meanings.  In one, Gonzales himself averred that

> The tear drop tattoos on my face did not mean that I had killed two people.

Gonzales also presented the affidavit of a private investigator, who related a hearsay conversation with a gang expert about what meaning the tattoos can have and was told that they have "many meanings."  Finally, a probation officer averred that the meaning of the tattoos "varies from gang to gang," and is most commonly associated with violence.  Only the third affidavit elicited even arguably admissible evidence.  The state habeas court denied relief, stating that the ineffective assistance claim had been treated on direct appeal.

18

In his federal habeas petition, Gonzales asserted for the first time that because the tattoos were the only evidence that he murdered both of the Aguirres, trial counsel rendered ineffective assistance by failing to rebut Robertson's opinion about the meaning of the tattoos.  Gonzales argued further that trial counsel could have nullified Robertson's opinion with the testimony of a street gang expert and that the prosecution knowingly allowed Detective Robertson to give the jury the false impression that his teardrop tattoos meant that he had killed any two people, including the Aguirres, when Robertson knew that such tattoos can signify the killing of a member of a rival gang.

At the federal evidentiary hearing, Robertson testified that, before trial, he did not talk to Gonzales's counsel about the teardrop tattoos.  He testified that, if they had asked him about the tattoos, he would have researched the topic more thoroughly and would have discovered that the tattoos had alternative, innocent meanings.  Officer McCann, the Odessa police department's gang expert, testified that he would have told counsel, had they interviewed him, that teardrop tattoos have many meanings, including mourning for a dead or imprisoned gang member, or prior incarceration.  Finally, a gang expert testified that teardrop tattoos relating to killings committed by the wearer usually have a different appearance and location than the ones on Gonzales's face.  He opined that Gonzales's tattoos are the "mourning" type

19

and that Robertson's trial testimony was misleading.

The State offers two theories why the evidence presented at the federal evidentiary hearing should not be considered. First, the State contends, albeit in a footnote, that Gonzales was not entitled to any federal evidentiary hearing, as he "failed to develop the factual basis" of his teardrop tattoo claim with admissible evidence in state court.  The State correctly relies on AEDPA for its formulation of the narrow grounds on which federal courts can conduct evidentiary hearings on habeas petitions from state convictions.   See 28 U.S.C. § 2254(e)(2) (permitting a federal evidentiary hearing if the defendant "has failed to develop the factual basis of a claim in State court proceedings" only if the federal claim relies on a new rule of constitutional law, a newly discovered factual predicate, or actual innocence supported by clear and convincing evidence).  But see Guidry v. Dretke, 397 F.3d 306, 323 (5th Cir. 2005) and opinion on denial of rehearing en banc.  Second, the State argues that this evidence is "unexhausted" because it was not offered in state court.  It is true that "[e]ven if the petitioner raises precisely the same legal claims in state and federal proceedings, reliance in the two proceedings upon different factual grounds that 'fundamentally' alter the legal claim will foreclose a conclusion that the claim is exhausted."  2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 23.3c, at 1087 (2005); see Graham v. Johnson, 94 F.3d 958, 968

(5th Cir. 1996). Here, it is not clear that Gonzales has presented "material additional evidentiary support that was not presented to the state court." Graham, 94 F.3d at 968. Instead, the testimony offered in the federal hearing simply reinforces his state court affidavits. In any event, we need not discuss these powerful procedural contentions further, because even if the evidence presented at the federal evidentiary hearing is considered, Gonzales has not proved that the state courts unreasonably determined his ineffectiveness claim.

While the district court found Gonzales's attorneys deficient, it also concluded that Gonzales was not prejudiced under Strickland because, considering all of the evidence against him, the tattoos were not critical to his conviction for both murders. The district court reasoned that the tattoos' significance concerning the murders was open to interpretation, even absent objection, and that the tattoos were not definitive like the fingerprint and ballistic evidence that implicated Gonzales in both murders.[7] It therefore concluded that there is not a reasonable probability that the result would have changed with expert

---

[7]      Gonzales asserts that the district court may have confused the facts of this case with another case, because the murder weapon was a knife, no fingerprint evidence was recovered from the scene, and there has never been any fingerprint or ballistic evidence implicating him in both murders.   It is Gonzales who errs.  One of Gonzales's fingerprints was found on the back of the stereo stolen from the victims' home.  Also, ballistics testing indicated that some empty shell casings found in a box at his home had been fired from the victims' .22 caliber gun that also was stolen from their home on the night of the murders.  Accordingly, the district court was not confused when it referred to ballistic and fingerprint evidence in this case.

testimony or argument challenging the meaning of the tattoos and when Gonzales acquired them.

Gonzales contends that Robertson's testimony that the two teardrops meant he had killed two people was extremely damaging because it was the only physical evidence that he personally killed both victims.[8]  He asserts that even if his counsel chose not to dispute the meaning of the tattoos, they could have argued that the tattoos were irrelevant because the State failed to prove that he acquired them after the Aguirres were murdered.

Gonzales also urges that the detective's interpretation of the tattoos was highly significant in the context of the whole trial.  The prosecution emphasized in closing argument that Gonzales had two tattoos; the prosecutor obviously regarded the testimony as important to proving that Gonzales killed two people. Defense counsel did not object to Robertson's testimony, did not present any alternative theory as to the tattoos' meaning during the guilt phase of trial, and never mentioned the tattoos in closing argument, despite the fact that the prosecutor referred to them as a silent confession to murdering the two victims.  The jurors were not informed that the meaning of the tattoos was open to interpretation—they had only heard Detective Robertson's

---

[8]     This argument is contrary to his state court contention that the teardrops were evidence of extraneous murders, and thus could be said to represent an unexhausted or procedurally defaulted claim.  The State does not so contend, however, and it seems reasonable that the implications of the tattoos may be considered irrespective whether they pertained to the Aguirres' murder, as the state courts found, or to extraneous murders.

testimony that they meant that Gonzales had killed two people.
Finally, although the State never proved when the tattoos were
obtained, the defense never pointed that fact out to the jury
during the guilt phase.

Despite Gonzales's comprehensive argument, we, like the
district court, conclude that Gonzales was not prejudiced by his
trial counsel's failure to refute Robertson's testimony regarding
the meaning of the tattoos.   That testimony is subject to
interpretation, as evidenced by the fact that Gonzales himself
argued in state court that the testimony related to extraneous
offenses, and not to the charged murders of Mr. and Mrs. Aguirre.
The lack of evidence concerning whether Gonzales got the tattoos
before or after the murders would have been obvious to the jury.
Most important, however, is that Gonzales's expert in the federal
habeas proceedings could not rule out the possibility that the
number of teardrops represented the number of people Gonzales had
killed.   If counsel had presented such expert testimony at trial,
the prosecution would still have countered that Gonzales's two
tattoos meant that he had killed two people.   At best, defense
attorneys could have argued that teardrop tattoos have multiple
meanings, one of which is inculpatory to Gonzales.

Further, expert testimony about the tattoos would not
change the fact that Gonzales confessed to Kenimer, nor would it
refute the other substantial circumstantial evidence that he

committed both murders.  The evidence presented at trial easily lends itself to the inference that Gonzales stabbed Mr. Aguirre, who was easily overcome, and then moved on to murder Mrs. Aguirre, who fought back valiantly.  Gonzales alone sold and profited from the Aguirres' possessions.  "[A]ny arguable weakening of the State's [teardrop tattoo] evidence resulting from testimony questioning [the meaning of the tattoos] must be viewed in light of the totality of the evidence the State produced at trial." Leal v. Dretke, 428 F.3d 543, 549 (5th Cir. 2005).

Given the strength of the evidence against Gonzales, it was not unreasonable for the state courts to decide both that Gonzales could not show a reasonable probability of a different result and that counsel's failure to investigate the tattoos, even if deficient, did not undermine confidence in the outcome of the trial.  We are mindful of the requirement that we must look "through the prism of AEDPA deference." Ward v. Dretke, 420 F.3d 479, 499 (5th Cir. 2005).  As noted in Ward: "While we may take issue with the correctness of this determination, we cannot say that it constitutes an objectively unreasonable application of federal law to the facts of this case.  "[W]e must always keep in mind that the statutory term 'unreasonable' requires a very high deference to state court decisions." Neal v. Puckett, 286 F.3d 230, 249 (5th Cir. 2002) (en banc) (Jolly, concurring); see also id. at 246 (per curiam) ("[O]ur focus on the 'unreasonable

24

application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence.").

### 3. Ineffective Assistance: Gonzales's Mother's Testimony

Finally, we consider whether the state court unreasonably applied federal law when it decided that trial counsel did not render ineffective assistance by failing timely to object to Detective Robertson's testimony that Gonzales's mother hid knives from him because she was afraid that he was going to kill her and his family.

Detective Robertson testified on direct examination that, after Gonzales's arrest, police found knives hidden under a couch cushion in the house where Gonzales lived with his mother, wife, and child.   The prosecutor asked who led the police to those knives, and Robertson responded:  "The criminalistics team found them.   Michael Gonzales' mother told me about them."   The prosecutor asked, "And why were they in there?"   Robertson responded:  "Because she was afraid that he was going to kill her and his family."   After the jury heard this testimony, defense counsel objected:

> Excuse me, your Honor, I was a little slow in getting on
> my feet on that one.  It's obviously hearsay and it is a
> rather extremely wild accusation that this lady harbored
> this fear from her son.  I object to that answer.  I
> object to the conclusion that this witness has drawn.
> There is no predicate for it.  There is nothing involved

25

in this case that would cause an investigation to be made
of such an allegation and I think that this statement was
made simply for the purposes of showmanship in front of
the jury.

Counsel asked the trial court to strike "the last remark" that
Robertson made and instruct the jury to disregard it.  The trial
court granted the motion and instructed the jury not to consider
"the last remark" for any purpose.

On direct appeal, the Texas Court of Criminal Appeals
characterized the testimony as "improper."  It concluded, however,
that Gonzalez had not demonstrated prejudice under Strickland
because he had "set[] forth no argument as to why the instruction
to disregard did not cure the error."  The state habeas court
denied relief on this claim on the ground that it was treated on
direct appeal.

Gonzales argues that he has proved prejudice: counsel
should have done more to prevent the jury from hearing this
damaging testimony or to protect Gonzales from it by requesting a
mistrial.  He contends that the jury was never told to disregard
the irrelevant fact that knives were found hidden under a cushion
in the home he shared with his mother; and that the testimony the
jury was instructed to ignore was so inflammatory that no
reasonable juror could have been expected to ignore it.  He asserts
that the state court's conclusion that the instruction to disregard
the testimony cured the error is unreasonable, in the light of the
enormous prejudice caused by a hearsay accusation that a client's

26

mother thought him capable of murdering her and his family.

The federal district court stated that it was hard to imagine that a juror could disregard testimony that Gonzales's mother hid her knives because she feared her son. Nevertheless, the district court concluded that the state court's decision was objectively reasonable and denied relief. We agree. Gonzales has not demonstrated that the state court unreasonably concluded that the trial court's instruction to disregard that testimony was adequate to cure any error, or that the state court unreasonably applied Strickland when it decided that counsel did not render ineffective assistance by failing to request a mistrial.

### III. CONCLUSION

The state courts did not unreasonably apply Strickland and Brady. The judgment of the district court denying Gonzales's petition for federal habeas relief on these conviction-related issues is, therefore,

**AFFIRMED.**